MacEWEN *v.* STATE

[No. 79, October Term, 1949.]

*Decided February 10, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Wesley E. Thawley* and *John Clarence North*, with whom were *Lawrence E. Birge* and *W. Brewster Deen* on the brief, for the appellant.

*Kenneth C. Proctor, Assistant Attorney General*, with whom were *Hall Hammond, Attorney General*, and *Harry E. Clark, State's Attorney for Talbot County*, on the brief, for the appellee.

GRASON, J., delivered the opinion of the Court.

John H. MacEwen, trading as Campbell-Ensor Company, was engaged in the business of selling advertisement specialties, such as pencils, book-matches, calendars, and fans, with offices at Easton, Maryland. The Maryland Credit Finance Corporation (called herein "Corporation") financed him in this business. From 1942 to 1944 there was no written agreement between the Corporation and MacEwen, and their transactions were conducted by oral agreement. In 1944 a written agreement was entered into. This agreement, which is filed as an exhibit in the case, required MacEwen to file with the Corporation, quarterly, a financial statement; it gave the right to the Corporation to select such orders placed with MacEwen by such business houses as it chose, and

the Corporation discounted these orders at their face value. To further secure the Corporation, MacEwen gave it a blanket assignment of all his assets.

The business was operated in this manner: MacEwen's salesmen solicited orders from business houses for calendars and other specialties. These orders were advertisement of a particular business, and the name of the customer appeared on the calendar or other form of advertisement. MacEwen placed these orders with firms for the purpose of manufacturing them. The business houses would not pay for these orders until they were delivered by MacEwen. On occasions these orders would not be ready for delivery for from nine months to a year, and would be paid for upon delivery. When these orders were received by MacEwen they were discounted by the Corporation, and it was the money thus received that enabled MacEwen to meet current expenses, such as payment of commissions to salesmen, to the concerns that manufactured these specialties, office expenses, and other expenses necessary to carry on the business. The concerns that placed such orders knew nothing of the financial arrangement between MacEwen and the Corporation. When an order that had been discounted was paid to MacEwen, under their agreement MacEwen was to promptly pay the money received to the Corporation.

This business prospered, and it grew from a mere trickle to an $80,000.00 a year business. Mr. Roulston, an official of the Corporation, has, from the inception to the termination of their business transactions, handled the MacEwen account. In 1947 Roulston told MacEwen that his business was too large and he would have to reduce it to not more than $40,000.00. He refused to discount further orders until the business had been so reduced. MacEwen did reduce his indebtedness to the Corporation by the sum of $16,000.00, in the summer of 1947. He had orders for calendars for the year 1948, and he persuaded Roulston to finance him for that particular business. Roulston accommodated him until about

March, 1948, when the Corporation refused to discount future orders until his business was reduced. After March 1948 his business collapsed and he was thrown into bankruptcy.

On May 17, 1949, the Grand Jury for Talbot County returned an indictment against MacEwen for obtaining the sum of $519.50 from the Corporation on the 19th day of May, 1947, by means of false pretense. A Bill of Particulars filed by the State, on demand of the traverser, charged that the false pretense by MacEwen "consisted of the representation that a certain written paper given to the Maryland Credit Finance Corporation, * * * on or about the twelfth day of May, in the year of our Lord nineteen hundred and forty-seven", was then and there a true and correct statement of the net worth of MacEwen when he then and there well knew he was insolvent. This statement was signed by the traverser on May 10, 1947, and filed as "State's Exhibit No. 2" in the case.

The defendant was tried in the Circuit Court for Talbot County, before a jury, and found guilty, and from a judgment and sentence, MacEwen appealed.

The questions presented to this court arise solely on rulings of evidence of the lower court. Mr. Roulston has been president of the Corporation since 1946, and prior to that time he was executive vice-president and secretary. He was called as a witness for the State. After describing the nature of MacEwen's business, he was asked: "Q. Now I hand you two more paper writings, Mr. Roulston, and ask you what they are—tell the jury?" This question was objected to and counsel for traverser stated: "* * * They claim that the false pretenses in question were perpetrated by a written financial statement dated April 30, 1947. At the same time they introduce a similar statement which was dated December 31, 1946; in other words, just four months prior to that. I didn't object to that because both of those statements are filed in the various bills of particulars in these analogous cases. * * * Now the question now arises in my

mind as to just how far we should go into other cases, because this man is not indicted for conspiracy, fraud or embezzlement or larceny. I think the Court should rule over what period of time he should be allowed to introduce financial statements." The court did not rule as requested by counsel. The witness then testified: "I have a financial statement submitted to us by John H. MacEwen, trading as Campbell-Ensor Company, dated January 2nd, 1946, and recording the condition of his business as of that date, signed by him as of that date, January 2nd. I have another dated July 31st, 1948, recording the condition of John H. MacEwen, trading as Campbell-Ensor Company, signed by Mr. MacEwen, and dated August 10th, 1948." These statements were then offered in evidence over the objection of the traverser. After stating that the relationship between the witness and MacEwen was satisfactory and one of trust and confidence, the witness stated: "That relationship went along until the middle of 1948, when I was pretty well convinced that some of the accounts that should have been paid to us had not been paid and, as a matter of fact, the funds from the customers had been diverted and not turned over to Maryland Credit in accordance with the agreement and the arrangement. My first go around with Mr. MacEwen on the subject, he told me that about $17,000.00 worth of customer payments had been accepted by him, not turned over to us. * * * Q. When did this happen, Mr. Roulston? A. This is during June of 1948." Counsel objected and the court heard his objection but made no ruling until after the following question: "Mr. Roulston, could you tell the court and jury when the diversions were made, if you know? A. I will have to finish my statement. $17,000.00 was the starter. Within a few days—(The Court) We will admit this subject to exception. A. Within a few days, under more pressure, I was told it was $24,000.00. Under greater pressure, lists were delivered that totaled over $36,000.00." That conversation which the witness had with MacEwen took place in June, 1948.

"(The Court) When did the conversions take place themselves? A. The numerous conversions took place in the preceding period of months and months in the past.

"Q. Can you approximate the time? A. Well, I would say from six to nine months in the past.

"Q. Six or nine months prior to June, 1948? A. Yes. These are small accounts, of course, made up of a multitude of accounts.

"Q. In other words, the statements which you discovered at that time ultimately totaled over $36,000.00? A. Yes, sir.

"Q. Which were converted, which had taken place six to nine months prior to June, 1948? A. That's correct. (Mr. Thawley) I object to any of this testimony going into the record."

There was no ruling by the court, and the witness continued to testify as to sizeable sums that were received by MacEwen from customers and not paid to the Corporation under his agreement with it. After Roulston had given this long and rambling account, Mr. Thawley, addressing the court, said: "Does your Honor feel that all of this should go in?" To which the court replied: "No, but the Court can't object for you, Mr. Thawley. (Mr. Thawley) I ask that it be stricken from the record, your Honor. I don't know how far back it should go. (The Court) Do you object to the last question? (Mr. Thawley) I object to the question and move that the answer be stricken out. (The Court) You should have objected soon enough, so we will overrule it." The witness was asked how much MacEwen owed the Corporation "at this time", and over objection he answered $63,909.39. On cross-examination the witness was asked about the conversions testified to in chief over objection of the traverser. The question was asked: "Now then, will you tell the Court and jury what false pretense Mr. MacEwen practiced on your corporation on May 19th, 1947, to obtain that check." To which he answered: "I must rely on the reports of my associates, which tell me that this statement is not a true

statement, therefore—(Mr. Thawley) I object and ask that the answer be stricken out. (The Court) Overruled." It appears that as to the accounts the witness testified to, he had no personal knowledge, but was repeating what his "associates" said. This testimony should have been stricken out. It was not competent for the witness to repeat what they told him. It was hearsay evidence, and reversible error. The objection was made when the witness first disclosed he was without personal knowledge of the matter.

It is contended by the State that the transactions between the traverser and the Corporation from the time they first commenced until 1948 were so connected, intermingled and related that the fair inference is that the accused intended to commit the offense charged in the indictment on the 19th day of May, 1947. By this contention, the State urges that the exception to the general rule of evidence applies. The traverser contends that the general rule applies, that is, that the State is confined to the proof of charge in the indictment; that extraneous evidence is irrelevant, and it would be unjust to force the traverser to defend himself against crimes not charged in the indictment.

It is stated in *Callahan v. State*, 174 Md. 47, at page 53, 197 A. 589, at page 592: "In the leading case of *People v. Sharp*, 107 N. Y. 427, 14 N. E. 319, 343, 1 Am. St. Rep. 851, the general rule as to the admission of testimony of former offenses in the trial of a defendant is thus stated: 'When a man is put upon trial for one offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his life-time is wholly excluded.'

"Stated differently, under our system of jurisprudence, the rule is, that evidence of a distinct substantive offense cannot be admitted in support of another offense. This is but the reiteration of the more extensive general rule that, in all cases, civil or criminal, the evidence must be confined to the point in issue. *Farris v. People*, 129

Ill. 521, 21 N. E. 821, 4 L. R. A. 582, 16 Am. St. Rep. 283. The application of the rule results in the exclusion of all evidence of collateral facts or of those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute; the reason being that such evidence tends to divert the minds of the jury from the real point in issue, and arouse their prejudices. Moreover, the adverse party would not be given notice by the charges in the indictment as to what evidence would develop as to such collateral crimes. *Janzen v. People,* 159 Ill. 440, 42 N. E. 862.

"This rule, however, is subject to a well-recognized exception, as firmly established as the rule itself, as 'when the proof shows such connection between the different transactions as raises a fair inference of a common motive in each'. In other words, if evidence is admissible on other general grounds it is no objection that it discloses other offenses. The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted. *Curry v. State, supra* [117 Md. 587, 83 A. 1030]; *Wentz v. State,* 159 Md. 161, 150 A. 278; *Lamb v. State,* 66 Md. 285, 7 A. 399; *Cothron v. State,* 138 Md. 101, 113 A. 620; *McAllister v. State,* 140 Md. 647, 118 A. 147; *Wharton's Crim. Evid.* (11th Ed.) Vol. 1, § 345." *Bell v. State,* 57 Md. 108; *Cothron v. State,* 138 Md. 101, 113 A. 620; *Cohen v. State,* 173 Md. 216, 195 A. 532, 196 A. 819; *Callahan v. State,* 174 Md. 47, 197 A. 589; *Wilson v. State,* 181 Md. 1, 26 A. 2d 770; *Mitchell v. State,* 178 Md. 579, 16 A. 2d 161; *McClelland v. State,* 138 Md. 533, 114 A. 584; *Hitzelberger v. State,* 174 Md. 152, 197 A. 605; *Young v. State,* 152 Md. 89, 136 A. 46; *Hunter v. State,* 193 Md. ???, 69 A. 2d 505.

In the trial of a misdemeanor (and false pretense is a misdemeanor) every element necessary to constitute the crime must be proved as a fact, and after the State, in a trial of a misdemeanor, has made out a *prima facie* case

of guilt of the crime charged, it may offer evidence, if relevant to the question of intent, that the prisoner committed other acts of false pretense where the prosecutor was the victim or where other persons were the victims of his false pretenses. It may also be shown that the traverser has committed the same or other similar crimes so connected with the crime charged that they will afford a fair inference that the traverser intended to commit the crime for which he is on trial. The law does not permit the proof of any such extraneous matter until the State has offered evidence which shows *prima facie* guilt. If the extraneous matter explains the action and movements of the prisoner both before and after the commission of the crime charged, it is relevant, even though the extraneous matter involves the commission of another crime, such as the case of *Cothron v. State, supra,* where the trial was for murder.

In the trial of the case at bar the charge was "obtaining money by false pretenses on the 19th day of May, 1947", and it was not competent for the State to offer extraneous matter, bearing on the question of intent, until it had made out a *prima facie* case of guilt that the traverser obtained money on the 19th day of May, 1947, as charged in the indictment. All of this extraneous matter offered by the State to prove intent was intended to show that the traverser received money for the Corporation, which he did not pay over to it, but diverted to his own use. If this constituted embezzlement (which we do not decide) it was not proof of extraneous matter which tended to prove that the traverser intended to commit the crime of false pretense on the 19th day of May, 1947. Indeed, the evidence offered shows that these diversions did not take place until after May 19, 1947, and if such was the case, in any view, such proof was irrelevant on the question that the traverser intended to commit false pretenses long before the diversions took place. There is no positive testimony in the case, and none from which it can fairly be inferred, that diversions by the traverser, of money belonging to the Corporation, took place at the

time or prior to May 19, 1947. While embezzlement is sustained by the diversion of a single sum of money at a particular time, in many cases it runs for a long period of time and consists of converting different sums of money on many dates to the use of the thief. False pretenses is not such a crime, and differs from the crime of embezzlement. In false pretense the money, or other personal property, is obtained from the owner by means of fraud; in embezzlement the property appropriated is not obtained by fraud, but is received by the culprit lawfully. It seems to the court plain that acts of embezzlement cannot be proved in a trial for false pretense for the purpose of showing that the culprit intended to commit false pretense. We are, therefore, of the opinion that the extraneous evidence offered by the State, which tended to show diversion by the traverser of money belonging to the Corporation was irrelevant and should not have been admitted in evidence. In other words, we hold that under the circumstances and proof in this case the general rule of law applies, and not the exception thereto as contended for by the State.

The testimony that we have quoted in this opinion clearly shows that counsel for traverser tried to exclude the irrelevant testimony we have referred to. The court at times made no ruling on his objection, and the same character of irrelevant testimony was admitted. And then the court said that his objection would be overruled because it was too late. Without referring to this testimony, it is the opinion of this court the objection was not too late. This irrelevant testimony was highly prejudicial, and is reversible error.

"The harm was done by placing the defendants in a position in which it became necessary for them to refer to and explain their connection with wholly irrelevant and immaterial charges which, while proving their character, which had been improperly put in issue by the State, had no connection with the crime for which they were being tried." Judge Offutt's opinion in *Dobbs v. State*, 148 Md. 34, at page 53, 129 A. 275, at page 283.

In Judge Urner's opinion in the same case he said: "If the case had been tried before a jury, instead of being submitted to experienced judges, I could have no hesitation in concluding that the irrelevant proof of the independent crime was prejudicial to the defense."

Indeed, in this case the irrelevant testimony had the effect of blasting the traverser's character before it was put in issue by him, and constituted reversible error.

The State contends that the traverser, by cross-examining Roulston and other witnesses as to matters that were admitted in evidence over the traverser's objection, waived his objection, and it quotes *Damm v. State,* 128 Md. 665, 97 A. 645; *Smith v. State,* 182 Md. 176, 32 A. 2d 863; *Purviance v. State,* 185 Md. 189, 44 A. 2d 474; *Courtney v. State,* 187 Md. 1, 48 A. 2d 430; *Barber v. State,* 191 Md. 555, 62 A. 2d 616, *Colie v. State,* 193 Md. ???, 69 A. 2d 497. We have examined these cases and we do not agree with the State that they are authorities for contending that the traverser waived his objection in this case.

In *United Rys. & Electric Co. v. Corbin,* 109 Md. 442, at page 455, 72 A. 606, at page 610, it is said: "When testimony has been admitted and an exception noted, counsel may deem it necessary to cross-examine the witness on the subject, and if it is simply a cross-examination he ought not to be deprived of his exception, provided the record shows he does not intend thereby to waive it, and that ought to be inferred when it is strictly cross-examination. There is perhaps some confusion in the cases on this subject, but the rule ought not to be carried to the extent of placing an attorney in the position that he must either waive his exception or permit the evidence in chief to stand without cross-examination. It is said in 2 Ency. of Pl. & Pr. 523, that a party cannot complain of the action of the trial Court 'that illegal or incompetent evidence was admitted which was called out by his own counsel on cross-examination of his opponent's witness, but when an exception is duly taken to the admission of illegal evidence it is not waived by

cross-examining the witness with respect to it.' We think that is the correct rule, and any statement in the opinions of this Court to the contrary must be modified to that extent."

It cannot be said in this case that counsel for traverser, by cross-examination of witnesses who had given in their examination in chief irrelevant testimony over his objection, intended to waive his objection. We hold that the exceptions were not waived.

*Judgment reversed with costs, and new trial awarded.*