553 A.2d 268

**Linda Faye STANCIL**

v.

**STATE of Maryland.**

**No. 900, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Feb. 9, 1989.

Certiorari Denied May 1, 1989.

Claire A. Smearman, Assigned Public Defender (Alan H. Murrell, Public Defender, on the brief) Baltimore, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Alexander Williams, Jr., State's

Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Submitted before GARRITY, ALPERT and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

This case involves the much publicized June 11, 1987 kidnapping of three-week-old Jeremiah Thate from his crib at Prince George's Medical Center. Linda Faye Stancil was arrested for the kidnapping on October 29, 1987 and indicted on four counts: 1) kidnapping and forcibly carrying away Jeremiah Robert Thate in violation of Md.Code Ann. Art. 27, § 337 (1957, 1987 Repl.Vol.); 2) kidnapping and forcibly carrying away Jeremiah Robert Thate, a child under the age of 16 in violation of Md.Code Ann. Art. 27, § 338 (1957, 1987 Repl.Vol.); 3) forcible abduction, taking, and carrying away of Jeremiah Robert Thate in violation of Md.Code Ann. Art. 27, § 2 (1957, 1987 Repl.Vol.); and 4) falsely imprisoning and restraining Jeremiah Robert Thate against his will. Stancil was tried before a jury in the Circuit Court for Prince George's County. At trial, the State entered a *nolle prosequi* as to Count 1 of the indictment. Stancil was convicted on the remaining counts and was sentenced to 30 years imprisonment, 15 years suspended.

On appeal, Stancil contends:

—The trial court violated the other crimes evidence rule by admitting the testimony of Dollie Vines that Stancil made a false application to the Department of Human Resources for food stamps.

—The trial court erred in denying Stancil's motion for judgment of acquittal on counts 2 and 3 since (1) there was a variance between the crimes charged in the indictment and the proof established at trial, and (2) the evidence was insufficient to prove the exact crimes charged in the indictment.

—The trial court erred when it instructed the jury that the force necessary to establish counts 2 and 3 was only that necessary to carry out the unlawful confinement or carrying away of the child.

Jeremiah Thate was born on May 22, 1987 to Theresa and Robert Thate. About two weeks later, Jeremiah became ill and the Thates, on their pediatrician's advice, took Jeremiah to Prince George's Medical Center. Jeremiah was diagnosed as having pneumonia and the Thates were instructed that Jeremiah would have to remain in the hospital for another week. Mrs. Thate spent almost all of her time at the hospital over the next couple of days. On June 11, 1987, while Mrs. Thate was breastfeeding Jeremiah, a black woman entered the room and asked Mrs. Thate several questions about Jeremiah and then left. About 3:00 p.m., Mr. Thate arrived at the hospital. He had brought some things for Mrs. Thate in a brown canvas Wilson gym bag. Around 4:00 p.m., the Thates notified the nurse that they were going down to the hospital cafeteria. When they left the room, Jeremiah was in his crib with an intravenous tube connected to his hand. After having dinner, they returned to the room and discovered that Jeremiah was not in his crib. Mr. Thate noticed that the intravenous tube was lying on the floor. Also missing were Mr. Thate's gym bag and a receiving blanket. They immediately notified the nurses' station. Panic set in as the Thates began to realize that their ill, 20–day–old baby was missing. The police arrived shortly thereafter and Mrs. Thate gave them a description of the woman who came into her room inquiring about Jeremiah. Later, at trial, Mrs. Thate testified that Stancil looked like the woman she described to the police.

At trial, the State called several witnesses who had seen Jeremiah with Stancil. Joyce Wood, Stancil's neighbor, testified that she saw Stancil on the morning of June 13, 1987, sitting in front of a shoe shop holding a little baby. Wood inquired about the baby and Stancil told her that the baby was an albino and belonged to her boyfriend's niece. Calvin Walker, a property manager for Inner City Property

Management, testified that he called on Stancil in June to inform her she had 30 days to vacate the premises because of a foreclosure on the building. Stancil asked Walker not to evict her because "she had nowhere to take her baby." Stancil invited Walker in to see the baby. Walker entered the apartment and he averred that, although it was dark, he was able to determine that the baby was fair-skinned. Raymond Wilson testified that he was Stancil's boyfriend, but had broken up with her before June. Sometime in June, he received a phone call from Stancil in which she informed him that he had a daughter. Wilson identified Jeremiah as the baby Stancil alleged was his.

On October 11, 1987, a fire was reported at Stancil's apartment building. Donald Derner, a firefighter in the District of Columbia, testified that he was dispatched to that fire. Derner identified Stancil as one of two women with a baby he saw departing from one of the apartments. Noticing that the baby appeared to be white, Derner approached the two women to get a better look. Derner asked the women if they were all right and in so doing Derner was able to ascertain that the baby was indeed white. Derner then contacted the Prince George's County police.

On October 28, 1987, Corporal Ellis Jones of the Prince George's County Police Department testified that he and Detective Dwight Deloatch were conducting an investigation regarding Jeremiah's abduction from Prince George's Medical Center. Pursuing that investigation, which had by then gone far beyond the local area, they went to Stancil's residence on a tip they had received regarding a white baby that had been seen with two black women at that location. While the officers were questioning Stancil, they heard a baby cry from a back room of the apartment. The officers asked to see the baby; Stancil went into the back room and returned with what Jones described as a white baby. Stancil informed the officers that the baby was hers. At that time, another woman came into the room and identified the baby as hers. The officers then requested a birth certifi-

cate or some other identification for the child but Stancil could not provide any. When Stancil was unable to furnish any identification for the child, the officers requested that both women bring the child with them to the Prince George's County Criminal Investigation Division in an attempt to locate any information pertaining to the child.

Upon arrival at the police station, Stancil voluntarily released the baby so that it could be taken to the hospital for a physical examination. After reading Stancil a constitutional waiver of rights statement, Deloatch took a written statement from her in which she stated that she was watching the baby for a Brenda Scott. Deloatch later learned that a blood test taken at the hospital revealed that the baby had the same blood type as Jeremiah Thate. He also learned that the footprint of the baby also matched that of the Thate baby. Acting on this information, Deloatch obtained a search warrant for Stancil's apartment and subsequently searched it. Before Deloatch left to search Stancil's apartment, he requested Detective Robert Davidson of the Prince George's County Police Department to interview Stancil. Davidson testified that he advised her of her *Miranda* rights and proceeded to take a statement from her. In her statement, Stancil admitted going to Prince George's County Medical Center where she saw Jeremiah lying in a crib. She further stated that she bit the intravenous tube to separate it from the baby and then placed him in the Wilson gym bag. She then left the hospital, got on a bus and took the baby home.

## OTHER CRIMES EVIDENCE

At trial, the court admitted into evidence the testimony of Dollie Vines, a social service representative from the Department of Human Resources. She stated that on July 8, 1987, one month after the the kidnapping, appellant made application for food stamps. She further averred that appellant had a baby with her and indicated on the application that it was hers. Vines could not identify the child other than the child had a light complexion. Appellant's applica-

tion for food stamps was also admitted into evidence. Appellant claims error in these admissions on the grounds that they violated the other crimes evidence rule. Appellant argues that the evidence served no legitimate need of the prosecution, but rather prejudiced the jury by serving only to establish appellant's criminal character.

In a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that which he or she is on trial is irrelevant and inadmissible. *Govostis v. State*, 74 Md.App. 457, 463, 538 A.2d 338, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988). Evidence of other crimes, however, may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged. *Ross v. State*, 276 Md. 664, 669–70, 350 A.2d 680 (1976). The trial judge has discretion in determining whether the evidence falls within one or more of these exceptions, but he or she should carefully weigh the necessity for and probativeness of the evidence against the prejudice which is likely to occur. *Cross v. State*, 282 Md. 468, 474, 386 A.2d 757 (1978).

The State argued, and the trial judge agreed, that the evidence was admissible under the motive exception since it gave the jury a logical reason why appellant took Jeremiah. In ruling that the evidence was admissible under the motive exception, the trial judge stated:

"People don't do things out of the clear blue sky, and unless the jury can see some logic or rationality as to why a person does something, the jury has some sort of a doubt, be it reasonable or not as to whether the person did it.

"When you show the rationality of why the person did this, and everything flows through, it assists the prosecution in proving his case. There is nothing wrong with that."

■ Although the trial judge was correct in his conclusion and theoretically correct in his assertion that the evidence added some rationality to why appellant took Jeremiah, we find that the trial judge's reliance on the motive exception was misplaced. Appellant's motive for taking Jeremiah was not an issue in the case, nor was it an element of the crime for which she was charged.[1] The decision of the trial judge, however, will not be reversed if the result is correct despite the fact that he or she relied on the wrong grounds. *Robinson v. State,* 17 Md.App. 451, 460, 302 A.2d 659 (1973). In the instant case, we find that the evidence was more appropriately admissible under the identity exception.[2] Evidence which is relevant to show that the accused possessed a fruit of the crime is admissible to show identity. *Cross,* 282 Md. at 477, 386 A.2d 757. *See also* McLain, *Maryland Evidence* § 404.11 (1987).

Here, appellant gave the police a written statement in which she admitted taking the baby and her reasons for doing so. A confession standing alone, however, is insufficient as a matter of law to support a criminal conviction unless accompanied or corroborated by some independent evidence. *Lemons v. State,* 49 Md.App. 467, 472 (1981). Thus, in order for the State to meet its burden of proof by establishing appellant's guilt beyond a reasonable doubt, *Johnson v. State,* 227 Md. 159, 163, 175 A.2d 580 (1961), it was required to submit independent evidence to corroborate the statement she gave to the police. The State then proceeded to elicit uncontroverted testimony from several

---

1. *See Martin v. State,* 40 Md.App. 248, 389 A.2d 1374 (1978), where evidence of the defendant's escape from prison was admitted to establish his motive for stealing a car three days later. In ruling that the admission of evidence was harmless error, this Court noted that motive was not a contested issue in the case, nor was it an essential element of the offense charged.

2. The instant case is distinguishable from *Tichnell v. State,* 287 Md. 695, 713 n. 5, 415 A.2d 830 (1980), where the Court of Appeals ruled that the identity exception was inapplicable because the defendant admitted his identity at the outset of the trial. Here, appellant admitted taking the baby in her statement to police.

witnesses, including Vines, who positively identified appellant as having possession of a light-skinned baby during the three months following the kidnapping.

■ Vines' testimony was circumstantial evidence of the fact that appellant was in possession of Jeremiah one month after the kidnapping and thus properly admissible under the identity exception. The food stamp application is additional proof of the fact that appellant was at the Department of Human Services on July 8. In addition, on the application, she acknowledged and claimed that the baby was hers. Moreover, even if we were to rule that the admission of Vines' testimony and the food stamp application was error, it was harmless error. Under the facts of this case, we find that proof of appellant's guilt was so overwhelming that the error complained of did not result in prejudice to appellant, nor did it contribute to the guilty verdict and thus, was harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

## SUFFICIENCY OF THE EVIDENCE

Appellant next contends that the evidence was insufficient to prove the allegation in the indictment and thus the trial court erred in denying her motion for judgment of acquittal. The crux of appellant's argument is that Art. 27, § 338, the kidnapping of a child under 16, is written in the disjunctive. Section 338 states in part that a person convicted of "kidnapping and forcibly *or* fraudulently stealing, taking or carrying away any child under the age of sixteen years ..." is guilty of a felony. (Emphasis added.) Thus, she argues, the statute creates two distinct offenses. One for forcibly carrying away and one for a fraudulent taking.

In the instant case, no allegation of a fraudulent taking was made; rather, appellant was charged with forcibly carrying away Jeremiah. Since the State did not produce evidence of force, appellant argues, the evidence was insufficient to support her convictions.

██ Although we find no merit to appellant's contention, we initially agree with appellant that, where a kidnapping statute sets forth in the disjunctive more than one means to accomplish the crime, proof of any one of them is sufficient to sustain the charge. *Austin v. State*, 160 Me. 240, 202 A.2d 794, 797 (1964), *cert. denied*, 382 U.S. 1018, 86 S.Ct. 636, 15 L.Ed.2d 533 (1966). *See Tate v. State*, 32 Md.App. 613, 616, 363 A.2d 622, *cert. denied*, 278 Md. 723, 736 (1976) (under Art. 27, § 337, forcible carrying is not necessary; it can be fraudulent). Our agreement with appellant, however, ends here. Insofar as her sufficiency argument, we hold that the evidence was sufficient to support the convictions as charged. We explain.

Section 338 was created especially for the protection of children. *Moore v. State*, 23 Md.App. 540, 546, 329 A.2d 48 (1974), *cert. denied*, 274 Md. 730 (1975). Kidnapping a child may be accomplished by a minimal amount of force and each case will depend upon the particular facts of the taking. *State v. Tillery*, 227 Kan. 342, 606 P.2d 1031, 1034 (1980). If the State produces evidence that the child was taken by force or fraud and then transported by the accused, it is sufficient to sustain a charge. *Moore*, 23 Md.App. at 547, 329 A.2d 48.

Appellant contends that her statement regarding how she removed the baby from the hospital demonstrates that no force was used. She said:

"I went to the room. I saw the little boy lying alone. I went in, pick the baby up, kiss him. He looked at me and smile. I turn and saw the IV in his arm, took a bite out of the tube, place him in the bag, and went to the door and to see if anyone was looking. No one was prying [sic] any tention, [sic] so I left and started for home with my brand-new baby."

██ Appellant mistakenly reasons that, since there was no assaultive behavior directed toward the baby, no force was used. Although there is no case law interpreting § 338 on this point, we note that § 337 and § 338 both require a

showing of a forcible or fraudulent carrying. In interpreting this language under § 337, this Court has held that the initial assaultive taking and carrying required at common law are no longer an essential part of the § 337 offense. *Tate*, 32 Md.App. at 616, 617, 363 A.2d 622; *see also Smith v. State*, 66 Md.App. 603, 610, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). Since the requisite language is the same under § 338, we similarly hold that an assaultive taking or carrying is not part of the § 338 offense.

If we were to follow appellant's reasoning to its logical end, children, incompetents, physically handicapped and the unconscious would not be protected by the statute if they did not resist in any manner or smiled as they were taken from their beds. It would ill serve the law to exclude as kidnappers those who prey on persons who cannot resist.

In the instant case, Jeremiah was three weeks old and thus incapable of resistance. Appellant separated Jeremiah from the intravenous tube, lifted and stuffed him into a gym bag. She then carried him out of the hospital and took a bus to her Washington, D.C., apartment. In *Watkins v. State*, 59 Md.App. 705, 724, 478 A.2d 326 (1984), we concluded that, where there is a lack of consent by the victim, force is present whether actual or by fraudulent coercion of the will. We find the State presented sufficient evidence of force under the statutes. Thus, the trial court did not err in denying the motion for judgment of acquittal.

Appellant was also charged under Art. 27, § 2 which requires a forcible abduction of a child under 12. Appellant similarly argues that the State failed to prove that she forcibly abducted Jeremiah. For the same reasons, we find that this argument also fails.

## JURY INSTRUCTIONS

Lastly, appellant alleges that the trial court erred in instructing the jury regarding the amount of force neces-

sary to establish kidnapping. The trial judge instructed the jury as follows:

"And lastly, with respect to force, the amount of force required for the crime of kidnapping is that force necessary to accomplish the unlawful confinement and carrying away. That's the only force you need find."

Appellant argues that the instruction failed to use language describing the assaultive behavior necessary to establish forcible kidnapping.

■ If an instruction which is given adequately and fairly covers the subject, no particular additional instruction is necessary. *Robinson v. State,* 66 Md.App. 246, 250, 503 A.2d 725, *cert. denied,* 306 Md. 289, 508 A.2d 489 (1986). In the instant case, the trial judge's instruction regarding the amount of force required under the circumstances was correct.

The crux of the crime of kidnapping is the unlawful detention against a person's will aggravated by asportation. *Johnson v. State,* 292 Md. 405, 433, 439 A.2d 542 (1982). As we have stated, the common law requirement of an underlying assault is not a part of the § 338 offense. Appellant's version would incorrectly state the law. Accordingly, we find no error.

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.