956 A.2d 791

**Isiah Michael RUDDER**

v.

**STATE of Maryland.**

**No. 0286, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 9, 2008.

428

Rachel M. Kamins (Gary E. Bair, Bennett & Bair, LLP, on the brief), Greenbelt, for appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: KRAUSER, C.J., HOLLANDER, and CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., J., (retired, specially assigned).

One of the law's ironies is that sometimes the solution to a problem begets a dozen new and unforeseen problems, that sometimes the answer to a question begets a dozen new and unforeseen questions. Thus it may have been with the Legislature's effort in 1961 to fashion a rational sentencing cap for those convicted of criminal conspiracy.

The appellant, Isiah Michael Rudder, was convicted by a Prince George's County jury, presided over by Judge Graydon S. McKee, III, of 1) robbery, 2) automobile theft, 3) theft of over $500 in value, 4) carrying a handgun, 5) transporting a handgun, and 6) conspiracy to commit carjacking and other lesser included crimes. On this appeal, he raises the five contentions

1. that Judge McKee erroneously imposed too high a sentence for the appellant's conviction on the conspiracy count;

2. that Judge McKee erred in seating a juror whose ability to be fair and impartial was arguably in doubt;

3. that Judge McKee erroneously failed to merge the conviction for automobile theft into the conviction for theft generally;

4. that Judge McKee erroneously failed to merge the theft conviction into the robbery conviction; and

5. that Judge McKee's sentencing was based on impermissible considerations.

### How Specific Must the Conspiratorial Purpose Be?

The appellant's first contention is a perplexing one, although it involves only sentencing. It raises some questions to which there may be no satisfactory answers. Is there a fundamental incompatibility between a lesser specificity required to try and to convict someone of criminal conspiracy and a greater specificity required to sentence the convicted conspirator? In all cases? No. In many cases? Yes.

The appellant contends that when the jury convicted him, under Count Ten, of conspiracy, it did not convict him of conspiracy to commit carjacking, with which he had been charged, but only of conspiracy to commit theft. For guilt purposes, they are, at least in the circumstances of this case, one and the same. For purposes of establishing the maximum sentence, on the other hand, they are not. The contention is a bit strained but it is plausible, and it will entail significant further analysis.

As far as the conviction for criminal conspiracy itself is concerned, whether the appellant's argument is right or wrong makes no difference. Either way, the appellant was guilty of conspiracy to commit a crime, to wit, to steal Mr. and Mrs. Nicknadavich's car on the night of February 24, 2006. Whatever particular crime or crimes were embraced within that generic conspiratorial purpose was surplusage and does not adversely affect the validity of the conspiracy conviction itself.

When it comes to sentencing the appellant for the conspiracy conviction, however, the appellant's contention makes a great deal of difference. A conspiracy to commit carjacking (armed or unarmed) carries a maximum penalty of 30 years. The appellant was sentenced to 30 years (with all but 15 years suspended). A conspiracy to commit the theft of property of the value of $500 or more (the Cadillac unquestionably was worth more than $500), by contrast, carries a maximum sentence of 15 years. Language that is mere surplusage in terms

of the validity of the conviction itself may ironically determine whether the sentencing cap is one of 30 years or one of 15 years.

## Sentencing a Convicted Conspirator

The aberrational quirk that this contention brings to light is that far less by way of specificity is required to charge one with criminal conspiracy and then to convict one of that conspiracy than is then required to sentence the defendant for the conviction. Some explanation is appropriate. The sentencing law for conspiracy was reformed in 1961. It would appear that 1961's solution to an earlier sentencing problem, however, has created a new sentencing problem. Time was when the degree of specificity required to charge and to convict one of conspiracy would also suffice to sentence one for conspiracy. That may no longer be the case.

■ Conspiracy is a common law crime. It arrived in our then proprietary colony as part of the unseen cargo of the *Ark* and the *Dove*. As a common law crime, it carried with it the common law penalty of anything in the discretion of the sentencing judge that was not, according to later constitutional scrutiny, cruel and unusual. *Gary v. State*, 341 Md. 513, 518 n. 5, 671 A.2d 495 (1996); *Archer v. State*, 145 Md. 128, 136, 125 A. 744 (1924). That open-ended penalty provision remained unchanged for 300 years, until Chapter 651 of the Acts of 1927 established that

"Every person convicted of the crime of conspiracy shall be liable to be punished by ... imprisonment ... for not more than ten years.

That sentencing provision, in effect for the next 34 years, did nothing to affect the parity between the specificity required to convict one of conspiracy and the specificity required to sentence someone for conspiracy. If the defendant was convicted of conspiracy, that was all the sentencing judge needed to know. No further fine-tuning or tweaking of the verdict was required. The obvious flaw with the 1927 sentencing provision, however, was that a defendant could, and some-

times did, receive a much harsher sentence for the inchoate conspiracy than for the consummated crime he conspired to commit. A conspiracy to scribble graffiti on a fence exposed one to the same maximum sentence of ten years as did a conspiracy to kill the king. There was a felt need for greater proportionality, necessitating some adjustment of the permissible sentence both upward and downward.

Chapter 691 of the Acts of 1961 was intended to be the solution, replacing the 1927 sentencing provision, which was repealed. As a side effect, however, it injected a specificity into the sentencing provision beyond that required to convict one of conspiracy. Codified for almost four decades as Art. 27, § 38, it is now Criminal Law Article, § 1–202. It is entitled "Conspiracy—*Limitation* on Punishment." (Emphasis supplied).

> The punishment of a person who is convicted of conspiracy may not exceed the maximum punishment for *the crime* that the person conspired to commit.

(Emphasis supplied). *See Gary v. State,* 341 Md. 513, 517–18, 671 A.2d 495 (1996); *DeLeon v. State,* 102 Md.App. 58, 62–63, 648 A.2d 1053 (1994); *Mills v. State,* 12 Md.App. 449, 465–66, 279 A.2d 473 (1971). The express purpose of the new sentencing provision was to insure that a convicted conspirator did not receive a harsher sentence for the inchoate conspiracy than he could have received for the substantive offense he conspired to commit. *Walker v. State,* 53 Md.App. 171, 187 n. 5, 452 A.2d 1234 (1982). In that regard the change did its job well. Problems, however, were inadvertently created.

It must be remembered that a criminal conspiracy may consist not only of a combination to commit a crime but also of a combination to do a lawful act by criminal or unlawful means. *Pearlman v. State,* 232 Md. 251, 257, 192 A.2d 767 (1963); *Garland v. State,* 112 Md. 83, 86, 75 A. 631 (1910) ("The agreement may be to commit a crime ... or to do a lawful act by a criminal or unlawful means."); *State v. Buchanan,* 5 H. & J. 317, 352 (1821); *Quaglione v. State,* 15 Md.App. 571, 578, 292 A.2d 785 (1972); *Wilson, Valentine and*

*Nutter v. State,* 8 Md.App. 653, 671, 262 A.2d 91 (1970); *Jones v. State,* 8 Md.App. 370, 375, 259 A.2d 807 (1969) ("Simply stated, conspiracy is a combination by two or more persons to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means."). This variety of conspiracy is admittedly a rare bird, but it is out there, peering at the sentencing provision like a demon in the night. The penalty provision of § 1–202 cannot apply in such a case for the direct objective of the conspiracy is not the commission of a crime. At first blush, one might conclude that such a conspiracy, therefore, could not be punished.

The answer to that dilemma may be to remember that § 1–202 is only a limiting provision and not an authorizing provision. In *Jones v. State,* 8 Md.App. at 375–76, 259 A.2d 807, Judge Orth explained that when the limiting statute does not apply, the sentencing judge may fall back on the discretionary common law sentencing procedure.

> *Today punishment is prescribed by statute, but only by way of limitation and applicable only when the object of the conspiracy is an "offense."* ... Thus it is when the object of the conspiracy is an indictable crime that the punishment for conspiracy to commit such crime may not exceed the punishment permitted for the object crime. *If the object of the conspiracy is some other act with regard to which it is unlawful to conspire, the punishment is under the common law and the length of the sentence is left to the discretion of the trial court.*

(Emphasis supplied).

As this Court's opinion in *DeLeon* further elucidated, the new sentencing provision of 1961 did not authorize sentencing for convicted conspirators. With the repeal of the 1927 sentencing law, the sentencing prerogative reverted to what it had been at common law, subject only to the limitation that is the subject of what is now § 1–202. *DeLeon,* 102 Md.App. at 62–63, 648 A.2d 1053, characterized both the new sentencing limitation for conspiracy and an analogous sentencing limitation for the inchoate crime of attempt.

There are now several sentencing provisions for conspiracy [and attempt] that have been provided by the Legislature. *As their very wording reveals,* however, *they are not authorizing provisions creating* in the trial court *the authority to impose sentence. They are,* quite to the contrary, *limiting provisions,* restraining, to the extent spelled out, the otherwise free-wheeling authority of the trial court to impose any sentence subject only to the constraints of its sound discretion and the constitutional inhibitions.... *[The new provision],* by its very terms, *is a limiting provision, not an authorizing provision.*

(Emphasis supplied). See also *Gary v. State,* 341 Md. 513, 517, 671 A.2d 495 (1996); *Jones v. State,* 8 Md.App. 370, 375, 259 A.2d 807 (1969) ("Today punishment is prescribed by statute, but only by way of limitation and applicable only when the object of the conspiracy is an 'offense.'"). The problem is that, notwithstanding *Jones v. State* and *DeLeon v. State,* there is a widespread and almost reflexive tendency to look to § 1–202 as an authorizing provision and not simply as a limiting provision. Such a Pavlovian reflex., however, could lead to sentencing paralysis.

Even in the more familiar world of conspiracy to commit a crime, moreover, a recurring problem is that many a valid conviction for conspiracy to commit a criminal act or acts never formally presumes to designate "the crime that the person conspired to commit." There is a world of difference between "crime" and **"THE** crime." Sometimes there is only one particular crime contemplated by the conspirators and its identity is self-evident. If the conspiracy involves a large and ongoing criminal syndicate for commercial gain, on the other hand, it may have no such simple objective readily identifiable as **"THE** crime" conspired at. If the conspiracy charge is an appendage to a multi-count indictment, placement on the sentencing ladder might seem to involve the establishment of an additional element, not required for the conspiracy conviction itself. In many conspiracies, there may be no such object as **"THE** crime." In other conspiracies, "the crime" may not

always be easy to identify. In either event, the application of § 1–202 may be perplexingly problematic.

## The Nature of a Conspiratorial Agreement

Putting sentencing considerations on a back burner for the moment, let us turn to the essential nature of the conspiratorial agreement itself. Historically, the crime of conspiracy never demanded the degree of specificity demanded for the trial of a consummated crime. The meeting of the minds, frequently informal and unspoken, that produced a criminal conspiracy was seldom, if ever, a meeting of the minds among criminal law professors, carefully calibrating which crime or crimes, with which precise sets of elements, was to constitute their conspiratorial purpose. The pleading requirements of the conspiracy law did not evolve to deal with conspirators as nuanced in their thinking as a Professor Moriarty.

Albeit having arrived in Maryland in 1634, conspiracy made its formal debut with the landmark opinion of the Court of Appeals in *State v. Buchanan,* 5 H. & J. 317 (1821). Conspiracy is still the common law misdemeanor that it was there recognized to be. With respect to conspiracy to commit a criminal act, the *Buchanan* Court announced:

> [A] conspiracy to do any act that is criminal *per se* is an indictable offence at common law, for which it can scarcely be necessary to offer any authority.

5 H. & J. at 351. *Buchanan* further made clear that the crime of conspiracy is complete without any overt act and that the particular means by which the criminal purpose is to be achieved need be neither alleged nor proved.

> *[E]very conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious or corrupt purpose,* or for a purpose which has a tendency to prejudice the public in general, *is at common law an indictable offence, though nothing be done in execution of it, and no matter by what means the conspiracy was intended to be effected;* which may be perfectly indifferent, and makes no ingredient

of the crime, *and therefore need not be stated in the indictment.*

5 H. & J. at 352 (emphasis supplied)

■ A century later, *Lanasa v. State,* 109 Md. 602, 71 A. 1058 (1909), addressed a defendant's complaint that his conviction for conspiracy was fatally inconsistent with his acquittal for the consummated crime conspired at. The conspirators in that case had simply failed to do the thing they had set out to do. At his sentencing hearing in the present case, the appellant made just such a claim. "I could not have conspired to commit a carjacking because the jury acquitted me of carjacking." The Court of Appeals, in rejecting such a contention in *Lanasa,* pointed out that conspiracy is a *fait accompli* without any overt act being done to carry out its purpose. Criminals sometimes fail. A failure successfully to carry out the plot, however, does not require the courts to go back and rewrite the plot. The conspiracy law's concern is with the plot as formed, not with the plot as executed.

> A conspiracy may be described in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose. . . .
> The *essence* of the offense consists in the *unlawful agreement and combination* of the parties; and, therefore, *it is completed whenever such combination is formed, although no act be done towards carrying the main design into effect.*

109 Md. at 607, 71 A. 1058 (emphasis supplied).

In terms of conspiratorial non-specificity, *Lanasa* noted the general nature of a criminal meeting of the minds and disdained any notion that greater specificity in charging is required.

> *Nor is it necessary to the completion of the crime that the conspirators should determine in advance what particular property should be injured or destroyed.* To hold that the law cannot interpose and arrest by criminal procedure the malicious purposes of the conspirators, unless they had agreed upon the destruction of some particular property would strip it of its most beneficent preventive powers and

leave the confederates at liberty to consummate their wicked purposes. *The law is not so impotent and ineffective.* As it is not essential to the completion of the offense that any particular property should be destroyed, *it is,* therefore, *not required that the object of the unexecuted conspiracy should be set out with great particularity and certainty in the indictment,* because only such facts need to be stated as shall fairly and reasonably inform the accused of the offense with which he is charged. *To require more in such a case would be to put an unnecessary burden upon the State, and make it impossible in many cases to secure the conviction of the guilty.*

*Id.* at 608, 71 A. 1058 (emphasis supplied). *Lanasa,* of course, could not foresee Criminal Law Article, § 1–202 and the possible impact that non-specificity might have on the 1961 sentencing cap for conspiracy.

■ *Garland v. State,* 112 Md. 83, 86–87, 75 A. 631 (1910), firmly established that an indictment for criminal conspiracy need not set out the crime conspired at with the specificity required of an indictment for such a consummated crime itself.

*In an indictment charging the common law offense,* the means by which an unlawful or criminal object is to be accomplished need not be stated, and in stating the object *it is only necessary for the indictment to show that the purpose of the conspiracy is criminal or unlawful.* When the agreement is to commit an offense known to the common law or created by statute, *it is not necessary, in stating the object of the conspiracy, to set out the offense with the accuracy or detail required in an indictment for that offense.* The reason for the rule is that the crime of *conspiracy does not consist in the accomplishment of the unlawful object,* or in doing the acts by means of which the desired end is to be attained, but *the essence of the offense is,* as we have stated, *the unlawful combination and agreement for any purpose that is unlawful or criminal.*

(Emphasis supplied). See also *Apostoledes v. State,* 323 Md. 456, 461–62, 593 A.2d 1117 (1991); *Monoker v. State,* 321 Md.

214, 221, 582 A.2d 525 (1990); *Townes v. State*, 314 Md. 71, 75, 548 A.2d 832 (1988).

In *Jones v. State*, 8 Md.App. 370, 375–76, 259 A.2d 807 (1969), Judge Orth provided a classic definition of conspiracy:

> Simply stated, conspiracy is *a combination* by two or more persons *to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. In Maryland it is a common law misdemeanor.* . . .
>
> In the context of the act to be accomplished, *conspiracy is a broad crime.* Nothing is better settled in the criminal law than the doctrine that a conspiracy to commit any crime, either as the end or as the means of accomplishing an end not criminal, is a misdemeanor at common law; and it is immaterial whether the intended crime be a felony or merely a misdemeanor, and whether it be criminal at common law or by statute only.

(Emphasis supplied). See also *DeLeon v. State*, 102 Md.App. 58, 62, 648 A.2d 1053 (1994); *Silbert v. State*, 12 Md.App. 516, 528, 280 A.2d 55, *cert. denied*, 263 Md. 720 (1971); *Randolph v. State*, 10 Md.App. 89, 92, 267 A.2d 767 (1970); *Regle v. State*, 9 Md.App. 346, 350–51, 264 A.2d 119 (1970).

### The Conspiracy In This Case

Against this backdrop of caselaw, the present case is an illuminating example. The evidence was legally sufficient to permit a finding that at approximately 9:25 P.M. on the night of February 24, 2006, the appellant, Arian Dorsey, and Charles Wright entered into their apartment in Bladensburg. The meeting of the minds on the part of his assailants was far from a textbook model of precise negotiation among them or of precise ideation on the part of any one of them. It sprang to life randomly and spontaneously when the three unexpectedly observed an attractive looking Cadillac being driven onto the parking lot. It was triggered by a single statement, as Charles Wright blurted out, "Let's go get that car," and the

other two, by their actions, enlisted in the enterprise.[1] Did the conspirators realize that they had joined a conspiracy? Did they appreciate the far-flung legal implications of the thing they had agreed to do? Of course not! Conspirators seldom do. They agreed to steal a car at gunpoint, and that's about it. That is all, moreover, that a conviction for the inchoate crime of conspiracy ever required.

In the universe of conspiracies, this one has to be at just about the outer edge. Far though it may be from the core concern that conspiracy law evolved to counteract, however, it does satisfy, even if just barely, the controlling definitions. In any event, no challenge to the conviction in this regard has been mounted.

### Conspiracy to Commit Generic Crime: No Charging Problem

In terms of the absence of any requirement that a charge of criminal conspiracy state with specificity some particular crime conspired at, *Hurwitz v. State*, 200 Md. 578, 92 A.2d 575 (1952), is the benchmark. The charge in that case alleged broadly that the defendant did conspire "to violate the lottery laws of the State." *Id.* at 581, 92 A.2d 575. Seven attendant counts then charged seven substantive lottery law violations.[2] Although pointing out that the subtitle "Lotteries" was comprised of sixteen separate code sections, the opinion nonetheless concluded that no further specificity was required.

---

**1.** In *Jones v. State*, 8 Md.App. 370, 377, 259 A.2d 807 (1969), this Court held:

> *[I]t is not necessary that a formal agreement be shown.* It need not be manifested by any formal words, written or spoken. *"It is enough if the parties tacitly come to an understanding* in regard to the unlawful purpose, and *this* may be inferred from sufficiently significant circumstances."*

(Emphasis supplied).

**2.** Each of the substantive convictions carried a maximum sentence of one year. For the conspiracy conviction, Hurwitz received a sentence of five years. This sentencing occurred, however, during the 1927–1961 sentencing regime, during which a convicted conspirator could receive a sentence of up to 10 years.

*The words* "to violate the lottery laws of the State" have a promiscuous sound, but mean in substance, *to participate in the conduct of a lottery, as broadly defined.*

*Id.* at 588, 92 A.2d 575 (emphasis supplied). *Robinson v. State,* 229 Md. 503, 184 A.2d 814 (1962); *Rouse v. State,* 202 Md. 481, 484, 97 A.2d 285 (1953); *Adams v. State,* 202 Md. 455, 97 A.2d 281 (1953); *Scarlett v. State,* 201 Md. 310, 315, 93 A.2d 753 (1953); *McGuire v. State,* 200 Md. 601, 603–04, 92 A.2d 582 (1952); *Gillespie v. State,* 147 Md. 45, 59–60, 127 A. 727 (1924); *Blum v. State,* 94 Md. 375, 378–79, 51 A. 26 (1902).

*Hurwitz* recognized that such broad and general language could present problems, 200 Md. at 582, 92 A.2d 575:

It must be admitted that ordinarily *the words "unlawfully violate the lottery laws of the State" do not* so definitely describe acts done as to *charge an offense; they even seem too indefinite to charge acts contemplated as the object of a conspiracy.*

(Emphasis supplied). The *Hurwitz* opinion nonetheless made clear that greater specificity in identifying a criminal purpose is not only not required but is sometimes in such a context not even possible.

*Though in some respects these principles and rules seems to permit loosely drawn indictments, in other respects they express only the logic and common sense (and sometimes the sheer necessity) of the case.* An indictment for robbery or larceny must ordinarily state the property stolen and the name (if known) of the owner. *If,* however, *pickpockets conspire to ply their trade in a public place it is manifestly impossible to state* what property they conspire to steal or *whom they conspire to rob.*

*Id.* at 585, 92 A.2d 575 (emphasis supplied). The Court of Appeals stated, however, that it would never "approve as a general formula for the statement of the object of a conspiracy" such an open-ended charge as a conspiracy "to violate the .... laws of the State." *Id.* at 588–89, 92 A.2d 575.

It might, of course, be argued that *Hurwitz v. State* was decided prior to the 1961 passage of the current conspiracy

sentencing provision and that it has, therefore, been superseded by implication. No such contention can be made, however, with respect to *Quaglione v. State,* 15 Md.App. 571, 292 A.2d 785 (1972), decided nine years after the new sentencing provision took effect. In *Quaglione,* the challenged indictment alleged generally that the defendant had "unlawfully conspired ... to violate the Narcotic Laws of the State of Maryland." The defendant's contention in that case was that the trial judge "incorrectly interpreted the jury's verdict as a finding of guilt of a conspiracy to violate the narcotic laws prohibiting the *sale* of controlled narcotics rather than the lesser crime of a conspiracy to unlawfully *possess* narcotics." *Id.* at 578, 292 A.2d 785. He objected to the greater sentence for conspiracy to sell as opposed to a lessor sentence for conspiracy to possess. Both, of course, would be embraced within a conspiracy to violate the narcotics laws. When one conspires to violate the "narcotic laws of the State," what precisely is "the crime" conspired at? Is it to sell or to possess? What is the maximum sentence following such a general conviction? Relying on *Hurwitz,* this Court found no fault with the lack of further specificity or with the decision of the trial court to impose the heavier sentence.

> The meaning of the phrase "narcotic laws of the State of Maryland" is evident and apparent to the appellant to the same extent that the meaning of "the lottery laws of the State" were held to be evident and apparent to the accused in *Hurwitz.*

*Id.* at 582, 92 A.2d 575. See also *Haina v. State,* 30 Md.App. 295, 314, 352 A.2d 874, *cert. denied,* 278 Md. 723 (1976).

In *Quaglione* the jury's verdict was arguably ambiguous in that it did not explicitly identify "the crime" that was the object of the conspiracy. This Court nonetheless placed its *imprimatur* on the trial judge's interpretation of the jury's verdict. On the basis of the evidence in the case and the jury instructions, the judge concluded that the jury had identified the object of the conspiracy as the selling of narcotics.

> In imposing sentence *the trial judge stated in effect that the evidence showed the basis of the jury's verdict was the*

*sale of marijuana . . . . He* therefore *interpreted the verdict as a finding of guilt of a conspiracy to unlawfully sell marijuana.* Considering the evidence in the light of the court's instructions together with the wording of the charge, we hold that *the trial judge did not clearly err in his interpretation of the jury's verdict.*

15 Md.App. at 579–80, 292 A.2d 785 (emphasis supplied). There would be, incidentally, no problem under *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), with such a resolution of ambiguity, because the judge was not making findings as to ultimate facts but was only interpreting what the jury's findings had been.

Although *McMorris v. State,* 277 Md. 62, 355 A.2d 438 (1976), focused primarily on an issue involving limitations, it also gave implicit approval to a count in an indictment charging the defendant generally with conspiracy "to violate the controlled dangerous substance laws of the State of Maryland." The significance of the Court's action, moreover, was highlighted by the dissenting opinion of Judge O'Donnell, *Id.* at 79–91, 355 A.2d 438, as he complained that

*[a]ll that it alleges is* that a *conspiracy* was entered into *to violate at least 28 different statutory proscriptions* included within the embrace of the generic term used.

*Id.* at 80, 355 A.2d 438 (emphasis supplied). The majority had no problem with that.

In *Winters v. State,* 301 Md. 214, 482 A.2d 886 (1984), the broad and generic criminal purpose alleged was that the defendant and others "did unlawfully conspire together to violate the Maryland Income Tax Laws." *Id.* at 233 n. 2, 482 A.2d 886. The defendant contended that "the count was defective" because "although the language . . . stated the conspiracy, it did not properly allege the object of the conspiracy." *Id.* at 234, 482 A.2d 886. The Court of Appeals held that nothing more specific was required.

*Appellant contends that since the income tax laws can be violated in a variety of ways, the indictment should set out*

*the particular means by which he and Osborn conspired together to violate those laws. We disagree.*

It is well settled in Maryland that *so long as the object of the conspiracy is set forth in the indictment there is no necessity to also set forth the means by which the conspiracy was intended to be accomplished. See Pearlman v. State,* 232 Md. 251, 192 A.2d 767 (1963) *(conspiracy to cheat and defraud customers* by wrongful and indirect means and false pretenses, etc. *sufficient), Piracci v. State,* 207 Md. 499, 115 A.2d 262 (955) *(conspiracy to defraud City of Baltimore—means to accomplish object of conspiracy need not be set out); Scarlett v. State,* 201 Md. 310, 93 A.2d 753 (1953) (conspiracy to violate lottery laws sufficient to charge a crime); *Quaglione v. State,* 15 Md.App. 571, 292 A.2d 785 (1972) (conspiracy to violate the narcotic laws of the state held sufficient). All of these cases demonstrate a consistent holding on the issue dating back to *State v. Buchanan,* 5 H. & J. 317 (1821), where our predecessors first held that in a prosecution for conspiracy, *it is sufficient to state in the indictment the conspiracy and the object of it; the means by which it was intended to be accomplished need not be set forth.* We see no need to depart from this well settled law.

*Id.* (emphasis supplied). All of this caselaw clearly treats the more specific crimes that might be perpetrated by the conspirators simply as "the means by which the conspiracy was intended to be accomplished." That reading of the term "means" was fully confirmed by the Court of Appeals in *Campbell v. State,* 325 Md. 488, 500, 601 A.2d 667 (1992):

In context and especially in view of the arguments made by Winters, "means" was used by both Winters and the Court to refer to the "acts", *i.e.,* crimes, proscribed by the applicable sections of Article 81.

None of those cases, however, was called upon to deal with the sentencing provision.

## A Question At Least Obliquely Raised; An Answer Deferred

The issue of how to apply § 1–202's sentencing cap was at least obliquely raised in 1991. First this Court and then the

Court of Appeals, however, resorted to "tunnel vision" in narrowly answering the literal question before the court as to the validity of a non-specific indictment and in deftly sidestepping the problem alluded to of how to determine the sentencing range for a non-specific verdict. In *Campbell v. State,* 86 Md.App. 158, 586 A.2d 32 (1991), which first came to this Court, the defendant was convicted of "conspiracy to violate the controlled dangerous substance laws." *Id.* at 159, 586 A.2d 32. The defendant contended that he could not properly be sentenced pursuant to such an omnibus charge.

> *Appellant first contends that* the indictment charging him, in pertinent part, with *conspiracy to "violate the controlled dangerous substances law of the State of Maryland," failed to state a cognizable offense.* He argues that, because *it failed to specify the crime which was the object of the conspiracy,* the conspiracy charge failed to give him notice of the precise nature of the charge against him, and that *the charge was not specific enough to allow him to determine the maximum penalty he would face if convicted.*

*Id.* at 160, 586 A.2d 32 (emphasis supplied).

This Court treated the literal issue before it as an attack on the charging document. In terms of its failure to give the defendant notice of the maximum sentence he might be facing, we found it unnecessary to address the question.

> The appellant did not object to the charging document in the court below. *As to his complaint that the indictment failed to give him notice [of the maximum penalty he faced], he has waived our review of it.* Md. Rule 4–252(a).

*Id.* at 161, 586 A.2d 32 (emphasis supplied).

In then turning to the unwaivable jurisdictional challenge to the facial validity of the indictment itself, our opinion looked to both *Quaglione v. State* and the opinion of the Court of Appeals in *McMorris v. State,* as it then concluded:

> Thus, we conclude that our holding in *Quaglione* remains the law and is determinative of this question. Therefore, we hold that *neither the controlled dangerous substances, i.e.,* cocaine, heroin, etc., *nor the activity, i.e.,* possession,

selling, distributing, etc., *need be specified when the short form conspiracy indictment is utilized.*

*Id.* at 165–66, 586 A.2d 32 (emphasis supplied). The trial judge was left forlornly to figure out the possible maximum sentence for himself.

Our decision in *Campbell* was affirmed in that regard by the Court of Appeals in its *Campbell v. State.* The Court of Appeals posed the issue before it as one challenging *the adequacy of a generalized conspiracy charge to support* not only the conviction but also *the punishment.*

> The issue for us to determine is *whether that count* of the indictment charging "conspiracy to violate the controlled dangerous substances law of the State of Maryland," *sufficiently characterized the crime* lodged against the petitioner; *does it contain sufficient "essential elements" of the crime of conspiracy to invest the circuit court with jurisdiction to try* the petitioner *and, if convicted, punish him?*

325 Md. at 495, 601 A.2d 667 (emphasis supplied).

In terms of the notice that must be given to a defendant, the opinion expressly pointed out that although a defendant must be informed of the fact that he is charged with conspiracy, he need not be informed of the precise crime that is the object of the conspiracy.

> [B]ecause it is not essential to the proof of conspiracy that its object be attained, the crime need not be alleged with such specificity as to render an indictment for it sufficient. This is consistent with the fact that *the offense of which the accused is required to be informed is the conspiracy, rather than the crime which is its object.*

*Id.* at 496–97, 601 A.2d 667 (emphasis supplied). The crime that is the object of the conspiracy need not be spelled out with great specificity.

> *To hold as the petitioner would have us do would be to require that,* in a conspiracy indictment, *when the commission of a crime is the object of the indictment, that crime*

*must be charged with the same specificity as if it were the substantive charge. That clearly is not the law.*

*Id.* at 501, 601 A.2d 667 (emphasis supplied).

The Court of Appeals concluded that a conspiracy "to violate the controlled dangerous substance law of the State of Maryland" was adequately particularized, notwithstanding the breadth of the subject matter that was covered.

*The charge, conspiracy "to violate the controlled dangerous substances law* of the State of Maryland," *sufficiently characterizes the crime of conspiracy so as to invest the circuit court with jurisdiction.* Sections 276–304 of Article 27 are codified under the subheading, "Health–Controlled Dangerous Substances...." *That the subheading* applies to numerous substances, having legitimate and illegitimate uses, and *prohibits numerous acts* when done in connection with those substances, *cannot be doubted,* but all those substances and prohibited acts (including the definitions critical to the proper understanding and interpretation of the subheading) are grouped together in one place for easy reference. Moreover, *they share, as we have seen, a common element:* their abuse is inimical to the health and welfare of the citizenry. Thus, *though numerous, the substances, and the proscribed acts* pertaining to them, *comprise, not an unlimited range of possibilities, but only a finite one.*

*Id.* at 501–02, 601 A.2d 667 (emphasis supplied).

With specific reference to a conspiracy defendant's entitlement to know what precise crime was being alleged as the object of the conspiracy in order "to determine the maximum penalty he faced," *id.* at 503, 601 A.2d 667, the opinion observed that a defendant could "challenge those omissions by motion filed pursuant to Maryland Rule 4–252(a)" *id.,* and that by failing to have filed such motion, "the defects were waived." *Id.*

To be sure, count 2 of the indictment did not inform the petitioner of the substance involved, how the conspirators intended to use it, or what they planned to do with it.

*Without that information, he did not have sufficient information to determine,* as he alleges, the precise nature of the crime which was the object of the conspiracy and, therefore, to determine *the maximum penalty he faced. The indictment might well have been,* on that account, *defective, enabling the petitioner to challenge those omissions by motion* filed pursuant to Maryland Rule 4–252(a). As we have seen, *no timely motion was made in that regard and accordingly, the defects were waived.*

*Id.* at 503, 601 A.2d 667 (emphasis supplied). The question of how to apply the sentencing cap remained unanswered.

### The Dilemma Remains

From the point of view of § 1–202's sentencing cap, the best of all worlds is that wherein there is the prosecution of a single crime with a perfectly symmetrical and clearly identifiable antecedent conspiracy. That pristine world does not always abide, however, and the problems for the sentencing cap generally appear in either of two classic configurations. The one we have discussed is the *Hurwitz–Quaglione–McMorris–Winters* configuration of conspiracy to commit generic crime. In that configuration, the charge of conspiracy is almost always no mere attendant count but is the flagship count of the indictment itself. In such a setting there is frequently, to the utter dismay of the sentencing cap, no such thing as "**THE** crime" the conspirators conspired to commit.

The other troubling configuration is that wherein the conspiracy charge is simply an attendant count at the end of, or in the course of, a multi-count indictment. In that setting there is, reassuringly, such a thing as "the crime" conspired at. The problem is that sometimes, as is the present case, there is difficulty, or at least disagreement, in identifying it. Both configurations warrant some comment.

### Conspiracy and Criminal Syndicates

Conspiracies to violate "the lottery laws of the State," "the narcotics laws of the State," "the income tax laws of the State," etc., by their very nature cover a 'wide range of potentially included crimes. They are examples of ongoing

criminal enterprises with sometimes avaricious commercial appetites. The substantive crimes conspired at are varied and they are many.

Criminal statutes frequently attack such targets as a gambling syndicate, *Adams v. State,* 202 Md. 455, 97 A.2d 281 (1953); the narcotics traffic, *Haina v. State,* 30 Md.App. 295, 352 A.2d 874 (1976); the pornography industry; or a prostitution ring, *Seidman v. State,* 230 Md. 305, 187 A.2d 109 (1962); on a broad front with a matrix of greater and lesser crimes with greater and lesser penalties. Some of those conspiracies go on for months, or even years. Some of them employ dozens, if not hundreds, of operatives. Over the life of a conspiracy, individual conspirators move in and out. Individual conspirators play a variety of greater and lesser roles.

A conspiracy to sell narcotics, for instance, contemplates not a single sale but countless sales, the more the better. What then is the maximum sentence for a conviction for conspiracy to sell narcotics? Is it the same penalty as that available for a single consummated sale of narcotics? Or is it that times fifty? Are plural objects of a conspiracy necessarily reduced to the singular? *Tracy v. State,* 319 Md. 452, 459–60, 573 A.2d 38 (1990), and *Mason v. State,* 302 Md. 434, 444–47, 488 A.2d 955 (1985), clearly establish that there is in this situation but one conspiracy. The problem with § 1–202, however, is that it calculates the sentencing cap not on the basis of the conspiracy but on the basis of the crime conspired at, which theoretically might be in the plural even if the conspiracy itself be in the singular. There is a difference between many conspiracies to commit many crimes and a single conspiracy to commit many crimes. Reducing the number of conspiracies does not reduce the number of crimes conspired at. The question is not how many conspiracies the defendant may be punished for (which is one), but what is the maximum penalty for that single conspiracy. That might arguably depend on the number of crimes he intended to commit. Section 1–202, on the other hand, uses "the crime" in the singular.

Although each conspirator may somehow have been involved in "the conspiracy," it is sometimes vexingly problematic as to

what precisely was "the crime that the person conspired to commit." Does the conspiracy itself have a specific crime as its purpose? Is that necessarily the purpose of each and every conspirator? For large and ongoing conspiracies, and even for some smaller *ad hoc* conspiracies, the very nature of "the crime" conspired at may be nothing more than a legal fiction. It may be that for many conspiracy convictions, therefore, the sentencing provision of § 1–202 is unworkable. In such a case, if the limiting provision, to wit, § 1–202, is inapplicable or unworkable, it would seem that sentencing must inevitably revert to the discretionary common law sentencing, as indicated by Judge Orth in *Jones v. State,* 8 Md.App. 370, 376, 259 A.2d 807 (1969).

### Sentencing and Multi–Count Indictments

The second situation in which the application of § 1–202 to a conspiracy conviction is problematic is that where a blanket conspiracy charge, as in the present case, is added to the end of a multi-count indictment. Although framed as a conspiracy to commit the "flagship" offense, the conspiracy logically embraces all of the lesser purposes represented by the entire descending ladder of lesser charges. In that sense the greater inclusive conspiracy might be said to embrace a number of lesser included conspiracies, although that is far from the best way of conceptualizing a conspiracy. In such a multi-count context, what necessarily is "the crime" conspired at for purposes of § 1–202? Although presumptively the aspiration of the original conspiracy will have been to "go for broke" no matter how far short of the goal the ultimate consummation may fall,[3] there may, at least theoretically, be cases, such as that which the appellant argues for here, in which the conspiratorial aspiration may have been more modest from the beginning.

Even in the smaller world of three young men, as in this case, getting together to steal a car, sentencing problems

---

3. "Between the resolution and the act falls the shadow."
 . . . T.S. Eliot, *The Wasteland.*

remain for a convicted conspirator. In today's sophisticated juridical world of multi-count indictments, even so simple a thing as stealing a car may reduce itself to no less than six counts ranging from armed carjacking to petty theft, with maximum sentences ranging from 30 years to 18 months. The prosecution, in the charging process, safeguards itself with half a dozen fall-back positions, anticipating the unreliable caprice of proof. The conspiracy count is not so finely calibrated because it is not so dependent upon what ultimately happens.

Ideally, the attendant conspiracy count, when appropriate, should be an omnibus charge, covering the entire spectrum of consummated substantive crimes. In such a multi-count indictment setting, an omnibus conspiracy charge is infinitely to be preferred over a grab bag of chaotic little conspiracy charges, one shadowing each lesser included substantive count. That sort of thing represents inexcusable pandemonium. In the setting of a multi-count indictment, however, pleading excesses do occasionally occur. Prosecutors are not immune to the tendency of multiplying charges. *Ezenwa v. State,* 82 Md.App. 489, 501, 572 A.2d 1101 (1990), makes it clear, however, that in these situations there is a robust omnibus conspiracy with remarkable elasticity capable of handling the situation and no need for a brood of little conspiracies running about. Judge Robert Bell, writing for this Court, diagnosed this problem of the promiscuous multiplication of conspiracy charges as a case of multiplicitous pleading, but he further pointed out that it is a non-fatal pleading malady that does not call for the dismissal of an indictment.

> The issue in this case is multiplicity rather than duplicity. *If two counts charging conspiracy are the same, the defect* in the indictment *is* that it contains *multiplicitous counts. Brown* [*v. State,* 311 Md. 426, 535 A.2d 485 (1988)], *supra. Such a defect is* a pleading defect and, consequently, *not fatal to the indictment.*

82 Md.App. at 501, 572 A.2d 1101 (emphasis supplied).

The saving grace is that no matter how many mini-conspiracies a defendant is convicted of, he will only be sentenced for a

single maxi-conspiracy. In making the point that multiplicitous pleading is not *ipso facto* fatal and that all that is required is that all manifestations of a single conspiracy be brought together at sentencing time, *Ezenwa* quoted with approval from *United States v. Maryland State Licensed Beverage Association*, 240 F.2d 420, 421 (4th Cir.1957):

> *If* the evidence showed that *there was only one conspiracy, the judge would impose only one punishment;* but *this is no reason for requiring dismissal of one of the counts in the early stages of the case;* and parties should not be allowed thus to try their case in advance and by piecemeal.

82 Md.App. at 501, 572 A.2d 1101 (emphasis supplied).

That the existence of multiple objects of a conspiracy does not thereby fragment the conspiracy is settled law. The Court of Appeals made the point very emphatically in *Mason v. State*, 302 Md. 434, 445, 488 A.2d 955 (1985):

> Ordinarily, *a single agreement to engage in criminal activity does not become several conspiracies because it has as its purpose the commission of several offenses.* Therefore, under Maryland common law, *irrespective of the number of criminal goals* envisioned by a single criminal agreement, *the conspirator is usually subject to but one conspiracy prosecution.*

(Emphasis supplied). *Mason*, 302 Md. at 446, 488 A.2d 955, quoted with approval from the opinion of the Supreme Court in *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942).

> Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. *The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.*

(Emphasis supplied). See also *Henry v. State*, 324 Md. 204, 240, 596 A.2d 1024 (1991); *Jordan v. State*, 323 Md. 151, 159–62, 591 A.2d 875 (1991); *Tracy v. State*, 319 Md. 452, 459–60,

573 A.2d 38 (1990); *Mason v. State,* 302 Md. 434, 444–47, 488 A.2d 955 (1985).

### Identifying "The Crime" Conspired At

■ Although the case law establishes that there is but a single conspiracy for sentencing purposes no matter how multifarious its objectives, it does not tell us how to identify, in a multi-count setting, "the crime" that necessarily was the object of the conspiracy.

■ Ideally, the conspiracy count will make reference to the first or titular count of the indictment. If there is any doubt, however, as to which substantive count the conspiracy count relates, the presumption will be that it relates to the most serious count. In an omnibus conspiracy charge, as in all other conspiracy charges, the conspiratorial aspiration is inevitably for maximum success. The aim of the conspiracy, therefore, takes the form of the flagship[4] crime, although it embraces, to be sure, all of the lesser included partial successes. The failure of the criminal enterprise to achieve maximum success, or even to achieve any success at all, does not devalue or depreciate the original conspiratorial purpose. A conspirator, like Ensign Nellie Forbush, is a "cockeyed optimist." He fully intends for the criminal plan to work with maximum success, and that almost invariably is the measure of conspiratorial purpose. The presumption would be in a case such as this that "the crime" conspired at would be the maximum crime charged in a multi-count indictment. Other factors, of course, may work to rebut that presumption, but with such a presumption is how to begin.

---

**4.** *Manigault v. State,* 61 Md.App. 271, 275, 486 A.2d 240 (1985), explained the use of the term "flagship count" in the context of multi-count indictments.

With these two indictments, as with most multi-count indictments, *the various lesser* included and other more or less related *counts take on coloration from the "flagship count." It is the "flagship count" that gives the entire indictment its name and its identity.*
(Emphasis supplied).

*Ezenwa v. State* dealt with a multi-count indictment. Ezenwa was charged and convicted of both a conspiracy to import heroin and a conspiracy to distribute heroin. The two conspiracies were merged into one. In sentencing for a conspiracy with two objects, Judge Bell admonished us to choose the one with the maximum sentence.

> [O]ne count in an indictment charging *conspiracy to import heroin and* another charging *conspiracy to distribute heroin are not necessarily two separate conspiracies;* they may well be alternative modes of committing the single crime of conspiracy.... *[T]he State concedes that there is but one conspiracy with two objects.* Accordingly *only one penalty should be assessed. That penalty should be determined by reference to the substantive offense having the greater maximum penalty.*

82 Md.App. at 504, 572 A.2d 1101 (emphasis added).

In *Tracy v. State,* 319 Md. at 459, 573 A.2d 38, the jury found the defendant guilty of conspiracy to commit murder, for which he was sentenced to life imprisonment, and of conspiracy to commit armed robbery, for which he was sentenced to 20 years. The single unit of prosecution was deemed to be the single conspiracy, and "the crime" conspired at and controlling the sentence was the greater, to wit, murder.

A similar choice of conspiratorial purposes was dictated in *Jordan v. State,* 323 Md. at 162, 591 A.2d 875.

> Through the single agreement, Tracy and Jordan conspired to commit murder and robbery. *Of the two, murder is the crime that carries the more severe penalty and consequently is the guideline offense under section 38 that Jordan "conspired to commit."*

(Emphasis supplied).

*Henry v. State* was dealing directly with the sentencing cap after two conspiracies were merged into one. Two conspiratorial purposes nonetheless remained as the objectives of that single conspiracy. The Court of Appeals held:

Henry was found to have *conspired with others to commit murder and robbery.* Of the two, the crime of murder carries the severe penalty. *Under* Md.Code (1957, 1987 Repl.Vol.) *Art. 27, § 38, the severe crime Henry "conspired to commit" was murder, and thus murder is the guideline offense for sentencing purposes.*

324 Md. at 240, 596 A.2d 1024 (emphasis supplied). See also *State v. Jenkins,* 307 Md. 501, 521, 515 A.2d 465 (1986).

The conspiracy count in this case expressly referred to its purpose as carjacking. The presumption is that the crime intended by the conspiracy was the flagship charge of carjacking. The appellant contends, however, that other circumstances rebut that presumption and served to reduce the object of the conspiracy, in the eyes of the jury, to something less than carjacking. The greater sentence, his argument goes, was hence unlawful.

### The Conspiracy Charge In This Case

The appellant's prime contention challenging his sentence on the conspiracy conviction is elusive and hard to pin down. Because it is largely confected out of unconnected bits and pieces, we are going to try to pin down each of those bits and pieces even if they do not seem to fit into an integrated contention. We will look first to the pleading.

The indictment in this case was a model of precision. The charging of the appellant for his consummated crimes was carefully calibrated. The consummated crimes were spread out along a broad continuum, in descending order of seriousness: 1) the felony of armed carjacking pursuant to Maryland Code, Criminal Law Article, § 3–405(c) with a maximum penalty of 30 years; 2) the felony of carjacking (without the element of being armed) pursuant to § 3–405(b) also (strangely) with the same maximum penalty of 30 years; 3) the felony of robbery with a dangerous weapon pursuant to § 3–403 with a maximum penalty of 20 years; 4) the felony of simple robbery pursuant to § 3–402 with a maximum penalty of 15 years; 5) the felony of theft of property of a value of $500 or more pursuant to § 7–104(a) and (g) with a maximum penalty

of 15 years; 6) the felony of motor vehicle theft pursuant to § 7–105 with a maximum penalty of 5 years; and 7) the use of a handgun in the commission of a crime of violence.[5] In that setting of a multi-count indictment for a single criminal episode, the conspiracy count took the flagship charge of armed carjacking as the crime that was the object of the conspiracy. The tenth and final count in the appellant's indictment alleged:

> The grand jurors of the State of Maryland for the body of Prince George's County, on their oath do present that Isiah Michael Rudder on or about the 24th day of February, Two Thousand and Six, in Prince George's County, Maryland *unlawfully conspired* with Arian Kavon–Jee Dorsey *to take unauthorized possession or control of a 2001 Cadillac automobile* from William Nicknadavich *by force or violence*, or by putting that individual in fear through intimidation or threat of force or violence, in violation of the common law of the State of Maryland and against the peace, government and dignity of the State. **(Conspiracy to commit carjacking).**

(Emphasis supplied). That was the only conspiracy count in the indictment. It was the only conspiracy count to go to the jury. There was no possibility of confusion. The indictment itself was beyond challenge. *Hurwitz v. State,* 200 Md. at 582–89, 92 A.2d 575; *Pearlman v. State,* 232 Md. 251, 257–60, 192 A.2d 767 (1963); *Cohen v. State,* 235 Md. 62, 72–73, 200 A.2d 368 (1964); *Quaglione v. State,* 15 Md.App. at 580–83, 292 A.2d 785.

■ In terms of that formal charge, all of the requirements of Criminal Law Article, § 1–203, dealing with the "charging document" for conspiracy, were fully satisfied. The charge recited the name of the defendant, the name of a co-conspirator, the date and county of the crime, and the crime conspired at. By charging the unauthorized taking of the Cadillac from William Nicknadavich by force or threat of force, the indictment alleged all of the necessary elements of the crime of

---

**5.** Two other handgun charges were in the original indictment but were nolle prossed by the State before the case was submitted to the jury.

carjacking. The count was, moreover, expressly designated as CONSPIRACY TO COMMIT CARJACKING. There was no problem in this case with the specificity of the charge of conspiracy to commit carjacking and all lesser included offenses. The charge was well pleaded.

## Legal Sufficiency of the Evidence

Nor is there any problem with respect to the legal sufficiency of the evidence. There is no question in this case about the legal sufficiency of the evidence to support the conviction on the charge of conspiracy to commit carjacking. Whether the crime intended was armed carjacking, pursuant to § 3–405(c), or simple carjacking, pursuant to § 3–405(b), is absolutely immaterial, because each is a felony with a maximum penalty of 30 years imprisonment. Either will admirably support the sentence imposed.

At the end of the State's case, the appellant made a cursory motion for judgment of acquittal on two carjacking counts, two robbery counts, and two theft counts. The motions were denied. The motions phase of the case then concluded, with the conspiracy count not even having been mentioned.

MR. MARTUCCI: In light of the Court's previous rulings, I would suppose the gun issue is the only remaining. I'll just do it for the record.

THE COURT: Denied. All denied. The defense may call its first witness.

MR. MARTUCCI: Thank you, Your Honor.

At the end of the entire case, the motions for judgment got equally short shrift, but conspiracy was at least mentioned, even if in a half-hearted fashion.

THE COURT: Do you want to renew your motions?

MR. MARTUCCI: I renew my motions.

THE COURT: The Court considers all the previous arguments made by the defense and—anything new?

MR. MARTUCCI: Nothing new.

THE COURT: Denied as to each and every count.

MR. MARTUCCI: I guess I'll move on the conspiracy count. I didn't see anything—

THE COURT: Yes, I'm going to allow it to go.

As long as consummated crimes are still on the table, the conspiracy count is frequently the overlooked stepchild-at least until it comes time to prepare the appellate brief.

## Jury Instructions

By the same token, the appellant cannot manufacture a viable contention about sentencing out of anything said during jury instructions. Judge McKee gave the following instruction on the crime of conspiracy.

> The defendant is also charged with the crime of conspiracy to commit the armed carjacking or the carjacking or the armed robbery or the robbery or the thefts. Conspiracy is an agreement between two or more persons to commit a crime. In order to convict the defendant of conspiracy, the State must prove, one, that the defendant or defendants entered into an agreement with at least one other person to commit one of those crimes, and that the defendants entered into an agreement with the intent that the crime be committed.

At the end of the instructions, the appellant registered no complaint about either the content or the adequacy of the instructions. His only reference to conspiracy seemed to be an out-of-place objection that the conspiracy charge was even being allowed to go to the jury. That can only be interpreted as a belated comment on the motion for judgment of acquittal. There was no remote mention of what is now the appellant's contention on appeal about identifying the crime conspired at.

THE COURT: Exceptions?

MR. MARTUCCI: Only to the conspiracy, which I don't believe was supported.

THE COURT: State.

MR. RUDDY: None.

THE COURT: Thank you. You may step back. We're going to go to closing argument after lunch.

## The Verdict Sheet

■ The conspiracy then was well pleaded, adequately proved, and the subject of unchallenged instructions. The appellant's problem is with the verdict. Even, *arguendo,* assuming preservation, the linchpin of the appellant's contention on appeal is based on the verdict sheet itself. It is the appellant's thesis that the jury, by its verdict as reflected on the verdict sheet, did not convict the appellant of conspiracy generally or of conspiracy to commit carjacking as charged but convicted him very specifically of conspiracy only to commit theft. The felony of grand theft (theft over) carries a maximum sentence of 10 years and would, the argument runs, under § 1–202 establish the maximum sentence for the appellant's conspiracy conviction at 10 years.[6]

Eight counts went to the jury, charging respectively 1) armed carjacking, 2) carjacking, 3) armed robbery, 4) simple robbery, 5) automobile theft, 6) grand theft, 7) the use of a handgun, and 8) conspiracy. As to each count, the jury was simply to put a checkmark over the word "GUILTY" or over the words "NOT GUILTY." The verdict sheet itself, with the jury's responses, was in its entirety as follows:

---

**6.** At a certain point in the argument before us, the appellant, in the context of trying to reduce the conspiracy to one charging theft, argued that in the absence of evidence to the contrary it must be assumed that the conspirators conspired to commit petty theft ("theft under"), with a maximum penalty of 18 months, rather than grand theft ("theft over"). We must point out, once again, that we are not dealing with the technical pleading requirements of an indictment. The verdict sheet, at most, refers back to the indictment.

In terms of what the jury may have found with respect to conspiratorial purpose, we cannot imagine why anyone, a juror or otherwise, would ever indulge in an assumption so contrary to conventional wisdom. It is difficult to conceive of thieving conspirators so penurious that they would not aspire to "top dollar" for their larcenous efforts. The actual value of what they steal may disappoint them, of course, but they certainly always hoped for better. In terms of value, what matters is not what the conspirators took, but what they hoped to take. In stealing cars, as an example, nobody ever aspires to steal a "lemon." To a thief, more is always better. In the absence of strong proof to the contrary, maximum value will be presumed to be the conspiratorial aspiration.

1. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **ARMED CARJACKING (WILLIAM NICKNADAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

2. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **CARJACKING (WILLIAM NICK-NADAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

3. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **ROBBERY WITH A DANGEROUS WEAPON (WILLIAM NICKNADAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

4. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **ROBBERY (WILLIAM NICKNA-DAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

5. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **AUTO THEFT (ANNA MAE NICK-NADAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

6. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **THEFT OVER $500 (ANNA MAE NICKNADAVICH)?**

 X
 _____ _____
 NOT GUILTY GUILTY

7. DO YOU FIND THE DEFENDANT NOT GUILTY OR GUILTY OF **USE OF A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE (WILLIAM NICKNADAVICH)?**

X
————————— —————————
NOT GUILTY GUILTY

8. DO YOU FIND THE DEFENDANT NOT GUILTY
 OR GUILTY OF **CONSPIRACY TO TAKE UNAU-
 THORIZED POSSESSION OR CONTROL OF A
 2001 CADILLAC AUTOMOBILE (WILLIAM NICK-
 NADAVICH)?**

X
————————— —————————
NOT GUILTY GUILTY

The appellant's argument relies entirely on the verdict sheet's description of the count as "conspiracy to take unauthorized possession or control of a 2001 Cadillac automobile." The appellant's argument is that that is the language of theft and that the additional element of force or threat of force that might elevate the charge to one of robbery or of carjacking is missing. The language the appellant relies upon, however, was surplusage. His point seems to be that if there is surplusage, it must be technically complete surplusage rather than partial surplusage. The job of the trial judge initially, and now our job, is to interpret, of course, what the jury said and not what the verdict sheet said.

 In pursuit of his thesis, the appellant makes several leaps of logic. Without the remotest glimmer of supporting legal authority, the appellant seems to want to impose on a verdict sheet the elaborate pleading requirements that control the validity of the indictment itself. The appellant maintains that if that eighth question to the jury is to be construed as a conspiracy to commit carjacking or a conspiracy to commit robbery, it must have alleged the element of force. There is no such requirement with respect to jury sheets. The other seven questions put to the jury in this case did not recite the elements of those seven respective crimes. The only specificity that is required of a verdict sheet, when more than one charge is submitted to a jury, is enough distinguishing or identifying language to tell one charge from another.

There was only one conspiracy for which the appellant was indicted. There was only one conspiracy charge that was sent to the jury. The eighth question asked whether the appellant was "not guilty or guilty of conspiracy." It also mentioned, incidentally, that the property that was intended to be taken was a "2001 Cadillac" and that the intended victim was William Nicknadavich, who was also listed as the victim of the robbery and carjacking counts. The conspiracy count was adequately distinguished from the other seven counts charging substantive offenses.

A question nonetheless remains: Even though no elements of a crime are required to be listed in a question on a verdict sheet, why, in this case, were some of the elements of a greater crime listed but not all of them? The answer to that may remain forever a mystery. The mystery, however, may be utterly immaterial. It depends on who was responsible for the gratuitous partial listing of elements and what, if anything, was intended to be communicated thereby. In this case, there was no input from the attorneys with respect to the wording or the configuration of the verdict sheet. The subject never arose. The judge prepared the verdict sheet completely on his own. The only brief mention of the verdict sheet came in the course of jury instructions. The instruction mentioned that eight charges were being submitted to the jury, including that of "conspiracy to commit armed carjacking." The jury was told that it would receive a verdict sheet on which it could answer "guilty" or "not guilty" to each of those charges. The instruction was:

> *The defendant is charged with* armed carjacking, regular carjacking, robbery with a dangerous weapon as to Mr. Nicknadavich, robbery, also as to him, and theft as to Anna Mae, who was the owner of the car, and theft, also under $500 as to Mrs. Nicknadavich. *The defendant is also charged with* the use of a handgun in the commission of a crime of violence, as well as *conspiracy with others to commit the carjacking.*
>
> The law requires that you consider each of those charges separately and *return a separate verdict as to each of the*

*charges. I've prepared a verdict sheet that has those ques-*
*tions that I just read to you. If you answer those ques-*
*tions, you'll have met that requirement of returning a*
*separate verdict as to each of the charges.*

(Emphasis supplied).

The jury was not instructed to amend or modify any of the charges. It was not instructed to ask itself or to answer any more specific sub-questions with respect to the conspiracy charge. The words on the verdict sheet on which the appellant relies were those of the judge and of the judge alone. Judge McKee, who phrased question eight on the verdict sheet, obviously did not think that his language referred to anything other than conspiracy to commit carjacking, because that was the charge he expressly told the jury that he was submitting to it. He had not reduced it to something less.

In closing argument, the prosecutor disposed of the entire subject of conspiracy in two unilluminating sentences, neither referring to the subtleties now being relied upon by the appellant. The appellant's only argument with respect to conspiracy was that no conspiracy at all had been proved. The argument was in its entirety:

The State wants you to convict him of conspiracy. You'll see in the instructions it's an agreement between two or more people to commit a crime. *I heard no evidence of an agreement. I heard no evidence whatsoever that there was any consortium,* if you will, or effort or consent on any particular action, whatever occurred. *I didn't hear any-thing that suggests that Mr. Rudder agreed with someone else to go take a car.*

(Emphasis supplied). In rebuttal, the State never mentioned conspiracy.

The jury rendered its verdicts simply by saying "Guilty" or "Not Guilty" to each of the eight charges in turn. It added nothing by way of marginal notes to the verdict sheet. It added nothing orally in rendering its verdicts. There is nothing to suggest that the verdict was anything other than one of guilty of conspiracy to commit a carjacking. Possible

nuances about the specific object of the conspiracy were never so much as on the periphery, let alone in the forefront, of anyone's mind.

Indeed, the first time that anyone seemed to be aware of a potential problem was when the trial reconvened for sentencing on January 26, 2007, three months after the jury had rendered its verdicts. Defense counsel read the verdict sheet as if it were an indictment, but was not sure where to go with the issue. He simply raised a question.

MR. MARTUCCI: *I just noticed* that on the verdict sheet, we have that he was found guilty—the language of the verdict was to take possession of the vehicle. *It's technically not a conspiracy to carjack.* I don't want this thing coming back. *I should have noticed it before, but I just noticed it this morning.*

(Emphasis supplied).

Neither the prosecutor, the defense attorney, nor the court could remember what the instructions to the jury had been, so everyone agreed to continue the sentencing hearing in order to get the jury instructions transcribed and to reconvene on April 17, 2007.

MR. MARTUCCI: *It's couched in the language of a theft.* Conspiracy to commit a theft is the way it's couched in the verdict sheet. . . .

. . . .

[The Prosecutor]: The problem I have is I don't know if they intended to convict him of conspiracy to commit carjacking because—

. . . .

MR. MARTUCCI: . . . *I can't draw the conclusion as to what they intended,* but the language in the verdict is not carjacking.

[The Prosecutor]: It is part of the language for carjacking. The only thing it doesn't have for the carjacking language is the force.

THE COURT: Here is what we do. .... I don't know of any other way. I hate to bring everyone back, but I think I have to order a transcript of the instructions so we can sit down and look at them. *I don't remember what I said.* (Emphasis supplied).

When the trial reconvened on April 17, 2007, however, defense counsel's argument with respect to the conspiracy conviction was a far cry from the argument he now makes before us. He had had ample time to study the question and to frame his objection. His argument was that the scope of the conspiratorial intent was limited by the crimes that were successfully consummated. He acknowledged that the jury had convicted him of conspiracy to commit carjacking but argued that the verdict should be set aside precisely because he had been acquitted of that substantive offense. The contention was that the appellant could not have aspired to do anything that the jury did not convict him of having done.

In addition, *there is that one issue,* Your Honor, of the conspiracy count to commit carjacking armed carjacking I believe, that as the Court notes in the transcript which I have provided, I did take exception to that instruction being given because there did not appear to be any evidence of a conspiracy to commit the armed carjacking, in addition to which *the jury acquitted him of the armed carjacking.*

So I would submit that *their finding of guilt as to the conspiracy to commit armed carjacking should be stricken and the Court should set aside that judgment.* Clearly, *had they found a conspiracy to commit a simple robbery for which they did find him guilty, I would have no problem with* it. But I think that that's going to create an appealable issue and I think the law is pretty clear, while you can have an independent conspiracy, it seems to me *the conspiracy should be consistent with the principal crime. In this case, it is robbery and not armed carjacking.*

(Emphasis supplied).

Defense counsel's final argument before sentencing was that the jury's not guilty verdict on the use of a handgun count

rendered inconsistent any verdict of guilty of conspiracy to commit a crime requiring the use of a gun. No argument remotely predicated § 1–202 as a limitation on sentencing or on the jury's having rendered a verdict of guilty of conspiracy specifically to commit theft was made.

Now, I would suggest that that would be inconsistent with a conspiracy to commit an armed carjacking, which the State suggests is still viable.

I would respectfully submit it would be reversible error in light of their finding of not guilty of use of a handgun when they found him guilty of robbery. *It's clear that the jury felt there was no weapon used, but that there was in fact a simple robbery by force,* but no weapon. And for those reasons, I would suggest the jury's verdict is inconsistent with the instruction and is inconsistent with the law and the other findings that the jury made in this case.

(Emphasis supplied).

Tantalizing as some of the issues suggested by this appeal may be, they are really not preserved for review in this particular case. The jury actually rendered a verdict of guilty of conspiracy to commit a carjacking, the only thing it was asked to do. It was never directed, by the court or by counsel, to dissect its verdict in more painstaking detail. There may be worlds of interesting possibilities spinning out there somewhere, but his case did not raise them.

### Non–Preservation of Challenge to Juror

■ By his second contention, the appellant claims that, during the voir dire examination, several of the responses by Prospective Juror # 36 arguably cast doubt on that juror's ability to be fair and impartial in the trial of the case. The appellant now contends that Judge McKee should, *sua sponte,* have struck that juror for cause. The short answer to the contention is that the appellant never asked to have the prospective juror struck and nothing, therefore, has been preserved for appellate review. *Scott v. State,* 175 Md.App. 130, 146, 926 A.2d 792 (2007). The appellant recognizes that generally foreclosing impediment to further review as he asks

us to consider the issue nonetheless, under some vaporous notion of "plain error." We are not remotely inclined to do so. *Austin v. State,* 90 Md.App. 254, 261–72, 600 A.2d 1142 (1992).

### Merger of Auto Theft Into Theft Generally

■ The jury convicted the appellant of both theft generally pursuant to § 7–104 and motor vehicle theft specifically pursuant to § 7–105. The theft charged was the theft of the Cadillac. The appellant received separate sentences for the two crimes, and he now contends that the two convictions should have merged. Under merger law generally and pursuant to § 7–105(d)(2) specifically, the appellant is right. Commendably, the State agrees. Accordingly, the conviction for motor vehicle theft on the Fifth Count will be vacated and deemed to have merged into the general theft conviction under the Sixth Count.

### Merger of Theft and Robbery

■ The appellant's fourth contention is that his conviction for theft on Count Six should have merged into his conviction for robbery on Count Four. Ordinarily, this contention would be a "slam dunk" for the appellant. Theft is a lesser included offense within the greater inclusive offense of robbery, for robbery is, by definition, a theft from the person accomplished by force or threat of force. Q.E.D.

The State, however, strains heroically to divide the seemingly indivisible. One has to wonder *Why?* The State seeks first to split the theft (under either theft count) from the robbery by distinguishing the theft of the car from the separate robbery (and theft) of the car keys. The State's brief recites:

> *[T]he sentences were based on taking two different pieces of property, the car keys and the car,* at different times and locations.... [W]hile the keys and the car were mentioned in the same counts, the indictment listed them separately— that is, that he stole a "Cadillac automobile and keys."

(Emphasis supplied). The State went on to rely upon the prosecutor's arguments to determine whether there was a single theft or multiple thefts:

> Second, *the prosecutor addressed the keys and the car separately in his opening statement and closing argument*—indicating that they were separate property taken from separate locations at separate times. *In his opening statement, the prosecutor said* that Rudder was the "person who stuck a black handgun in the side of Mr. Nicknadavich, took his keys, and then proceeded to take his car and drive off." ... *In closing, the prosecutor emphasized* that the keys and the car were separate: "Be certain, there's two pieces of property here. There is the keyless entry in the keys [sic], and then there is also the car. Two different pieces."

(Emphasis supplied). It is a strange selection of authority to cite. Saying something does not make it so.

The State also seeks to drive a wedge between the husband and wife as separate victims of separate crimes.

> *[T]he verdict sheet distinguished between the two victims and implicitly between the taking of the keys and the taking of the car. The verdict sheet indicated that* the robbery counts related to Mr. Nicknadavich—that is, the person from whom the keys were taken. *The verdict sheet also indicated that* the theft over $500 count related to Mrs. Nicknadavich, the owner of the vehicle.
>
> The robbery and the theft involved separate takings of separate property from separate victims at separate times and separate places. Thus, the trial court properly imposed separate sentences.

(Emphasis supplied). We ordinarily resolve an issue such as this by looking first at the charging document (the indictment) and then at the actual evidence in the case. The State, however, relies exclusively on the verdict sheet. We are not pointed to any legal precedent for such reliance, and we know of none. A verdict sheet is a shorthand reference and not a formal pleading.

The crimes for which the appellant was on trial and for which the appellant was convicted were controlled by the terms of the indictment itself. In *Thompson v. State*, 119 Md.App. 606, 617, 705 A.2d 322 (1998), this Court stated:

> [T]he question of whether certain counts charge crimes that are lesser included offenses within other counts or, on the other hand, charge unrelated criminal conduct, *can frequently be resolved within the four corners of the indictment.*

(Emphasis supplied). Judge Wilner spoke to the same effect in *Anderson v. State*, 385 Md. 123, 140–41, 867 A.2d 1040 (2005):

> In determining the scope of the former conviction, *the court must ordinarily look at the effective charging document upon which judgment was entered,* not just the evidence presented in support of that charge. We have often made clear that *the primary purpose of a charging document is to inform the defendant of the accusation against him/her* by so describing the crime "as to inform the accused of the specific conduct with which he is charged," in order, among other things, to "protect[ ] the accused from a future prosecution for the same offense."
>
> . . . .
>
> *In most cases, the only sensible and workable criterion for determining the nature and scope of the prior offense is the effective charging document. That states the offense for which the defendant was tried.*

(Emphasis supplied).

Count Four, the robbery count, named William Nicknadavich as the robbery victim and further alleged that what had been taken from him by force were both the car and the car keys, as it charged that the appellant "did feloniously rob William Nicknadavich of [a] 2001 Cadillac automobile and keys." Count Six, the theft count, also referred to precisely the same victim and precisely the same property, as it charged that the appellant "stole a 2001 Cadillac automobile and keys of William Nicknadavich having a value of $500 or more."

Even if, moreover, one could dissect the victims and the items of property one from the other as surgically as the State purports to do, merger would still be compelled. Maryland Code, Criminal Law Article, Title 7, dealing with Theft and Related Crimes, includes Maryland's Consolidated Theft Law. Section 7–103(f) deals specifically with the gravitational pull of aggregation.

(f) *Course of conduct—Aggregation—When theft is committed* in violation of this part *under one scheme or continuing course of conduct, whether from the same or several sources:*

(1) *the conduct may be considered as one crime;* and

(2) the value of the property or services may be aggregated in determining whether the theft is a felony or a misdemeanor.

(Emphasis supplied). Subsection 7–103(f) was taken, without substantive change, from its predecessor provision, Art. 27, § 340(n)(5), part of the original Consolidated Theft Act of 1978. In Moylan, *Maryland's Consolidated Theft Law and Unauthorized Use* (MICPEL, 2001), § 11.9, analysis was made of a matrix of no less than four situations in which aggregation might occur. The appellant's present contention is covered by the first two of those situations.

Section 340(n)(5) has added a dimension to the phenomenon of aggregation. *Aggregation* itself *is the process of adding together the values of what might be considered a number of lesser thefts in order (1) to reduce the number of crimes being charged* and (2) to raise the value of the stolen property in the combined or omnibus charge. Before dealing with the new and possibly problematic dimension of potential aggregation, a review of aggregation's preexisting and now settled dimensions is helpful. *The matrix of potential aggregations covers four situations:*

1. *The theft of multiple items from a single owner on a single occasion.*

2. *The theft of multiple items from multiple owners as part of a single episode on a single occasion.*

3. The theft of multiple items from a single owner, pursuant to a common scheme, but on a continuing basis on a number of separate occasions.

4. Pursuant to a common scheme, the theft of multiple items from multiple owners from different places or on different occasions.

(Emphasis supplied).

## The Theft of Multiple Items From a Single Owner on a Single Occasion

When the car keys were taken from William Nicknadavich at gunpoint, the car itself was sitting just 50 feet away. The appellant and his companions ran immediately to the car, started it with the stolen ignition key, and took off. What was involved was indisputably what § 7–103(f) referred to as "one scheme or continuing course of conduct." The key and the car were one. *Maryland's Consolidated Theft Law, supra,* § 11. 10, addressed the matter squarely:

*Where multiple items are stolen from a single owner on a single occasion, the case for aggregation is so compelling that it is generally taken for granted.* If a pickpocket lifts from the pocket of a victim five $1 bills, there is a single theft of $5 as surely as if he had lifted from the same pocket a single $5 bill. If a thief steals from a homeowner (1) a set of silverware, (2) a diamond ring, and (3) a television set, it is a single theft and not three. *A fortiori,* a theft of the family silverware is not 36 or more thefts of 12 spoons, 12 forks, 12 knives, etc.

*It is to the defendant's obvious benefit that the number of crimes has been reduced.* It is to the defendant's obvious detriment that the gravity of the remaining crime has been enhanced. "To many thieves *the single larceny doctrine* has the potential for being more a menace than a shield." In any event and regardless of benefit or detriment, *the unit of prosecution is the total episode of obtaining or exerting unauthorized control over the property of another,*

regardless of the amount of property taken. *It is not each item of property thus appropriated.*

(Emphasis supplied).

In *Govostis v. State,* 74 Md.App. 457, 538 A.2d 338 (1988), the defendant was convicted of two separate thefts and sentenced on each. This Court agreed with the defendant that "the two convictions and sentences for theft should have been merged because the stolen items were acquired 'in a single continuous course of conduct.'" *Id.* at 459, 538 A.2d 338. Judge Bloom's legal analysis there is fully dispositive of the issue before us here.

*Appellant's indictment contained separate theft counts, one charging theft of the Lincoln, a felony (Count 6), and the other charging theft of clothing and other items belonging to the victim, a misdemeanor (Count 7).* Ford testified that on the night of the murder he and appellant loaded the car with the victim's belongings and then drove away in the car. *Appellant urges that "the two convictions and sentences for theft must be merged because the taking of the items in a single, continuous course of conduct amounted to a single theft." We agree.*

*It has long been the law in Maryland that "... the stealing of several articles at the same time, whether belonging to the same person, or to several persons, constitute[s] but one offense.* It is one offense because *the act is one continuous act—the same transaction." State v. Warren,* 77 Md. 121, 122, 26 A. 500 (1893). In *Horsey v. State,* 225 Md. 80, 83, 169 A.2d 457 (1961), the Court of Appeals held that where "separate takings [are] pursuant to a common scheme or intent ... [even] the fact that the takings occur on different occasions does not establish that they are separate crimes." And in 52A C.J.S. *Larceny* § 53 (1968), it is succinctly stated:

*Where several articles are stolen* from the same owner at the same time and place, *only a single crime is committed,* and *the taking of separate articles of the same owner from different places in the same building, pursuant to a single*

*criminal impulse, usually is held to constitute only a single [crime].*

It is apparent from the record that Ford and appellant stole the Lincoln and the victim's clothing pursuant to *a common scheme or a "single criminal impulse."* Ford, testifying for the State, averred that, prior to the murder, he and appellant decided to leave the victim and to take all the victim's belongings as well, lest there be another gun among his belongings. *Stealing the victim's personal effects as well as his car were not separately conceived crimes; there was but one criminal scheme and one criminal intent, thus one theft.* The separate conviction of theft of the goods valued at less than $300, based upon the taking of the victim's clothing and personal effects, cannot stand.

74 Md.App. at 470–71, 538 A.2d 338 (emphasis supplied).

### Thefts From Multiple Owners On a Single Occasion

In its effort to multiply the number of convictions and the number of sentences, the State will be no more successful in separating Mr. Nicknadavich from Mrs. Nicknadavich than it will be in separating the car from the car keys. *Maryland's Consolidated Theft Law,* § 11.11, discussed Maryland's reliance on the "single larceny" doctrine.

*The theft of multiple items from multiple owners on a single occasion invokes application of the so-called "single larceny" doctrine.* Technically speaking, the first set of circumstances—the theft of multiple items from a single owner on a single occasion—is also an instance of the single larceny doctrine. It, however, is the noncontroversial and seldom litigated aspect of the doctrine. In contrast, this second set of circumstances—*thefts from multiple owners on a single occasion—has generated significant litigation under the single larceny doctrine.*

In *State v. White[,* 348 Md. 179, 702 A.2d 1263 (1997) ], Judge Wilner analyzed thoroughly the single larceny doctrine generally and its historic applicability in Maryland. As early as *State v. Warren[,* 77 Md. 121, 122, 26 A. 500 (1893) ], the Court of Appeals posed the question: *"Does the*

*stealing of several articles of property at the same time, belonging to several owners, constitute one offense,* or as many separate offenses as there are different owners of the property stolen?" *The Warren court concluded that "such stealing could constitute but one offense."*

(Emphasis supplied).

As early as *State v. Warren,* the Court of Appeals had held:

Upon principle, however, it would seem clear that *the stealing of several articles at the same time, whether belonging to the same person, or to several persons, constituted but one offense. It is but one offense, because the act is one continuous act—the same transaction;* and the gist of the offense being the felonious taking of the property, we do not see how the legal quality of the act is in any manner affected by the fact, that the property stolen, instead of belonging to one person is the several property of different persons. . . .

77 Md. at 122–23, 26 A. 500 (emphasis supplied).

In *State v. White,* 348 Md. 179, 702 A.2d 1263, Judge Wilner thoroughly reviewed Maryland's adoption of the single larceny doctrine in 1893, its adherence to it ever since, and the almost universal acceptance of the doctrine throughout the common law world. The opinion held squarely that the passage of Maryland's Consolidated Theft Act in 1978 did not adversely affect in any way the vitality of the single larceny doctrine in Maryland.

*The issue before us is whether the "single larceny doctrine" is alive and well in Maryland under the Consolidated Theft Statute* enacted by the General Assembly in 1978. The single larceny doctrine addresses the question framed by us 104 years ago in *State v. Warren:* "Does the stealing of several articles of property at the same time, belonging to several owners, constitute one offense, or as many separate offenses as there are different owners of the property stolen?" *In Warren, we concluded that such stealing could constitute but one offense. We do not believe that the*

*Legislature intended to change that result or did change it, in enacting the Consolidated Theft Statute.*

348 Md. at 180–81, 702 A.2d 1263 (emphasis supplied). See also Daniel H. White, Annotation, "Single or Separate Larceny upon Stealing Property from Different Owners at the Same Time," 37 A.L.R.3d 1407 (1971).

We hold accordingly that the appellant's conviction for the theft of property of the value of $500 or more under Count Six is hereby ordered to be merged into his conviction for robbery under Count Four.[7]

### Sentencing Considerations

 The appellant's final contention is that Judge McKee relied on an improper consideration in sentencing him. Other than pronouncing the sentences, however, the only comment made by the judge was:

THE COURT: That sentence is based upon the fact that I feel, *based upon the situation of this case,* that you are a true danger, particularly to the elderly people, and Mr. Martucci, your lawyer, is rapidly approaching that category.

MR. MARTUCCI: I think I've arrived.

THE COURT: I'm already there. Thank you.

MR. MARTUCCI: Thank you, Your Honor.

(Emphasis supplied).

We see nothing improper in that. Mr. Nicknadavich, from whom the car keys were taken at gunpoint, was 87 years of age at the time he was attacked. Mrs. Nicknadavich was 78.

---

7. We must note an exquisite metaphysical problem, even if not a practical one. How can the conviction for motor vehicle theft have merged into the conviction for theft generally, as we have held that it did, if that recipient conviction for the merger has, in its turn, now itself been vacated? Can something merge into nothing? As a practical matter, of course, both of the theft convictions, in no particular chronological order, ultimately merge into the robbery conviction. Whether that telescoping process is a one-step procedure or a two-step one is a metaphysical problem best left to the metaphysicians. Whether in one puff or in two, the conviction for motor vehicle theft, wherever it went, is now gone.

The court's observation about the victims' ages was supported by the evidence and appears to have been completely appropriate.

In *Gary v. State*, 341 Md. 513, 516–17, 671 A.2d 495 (1996), Judge Chasanow described the limited range of sentencing review.

> The discretion of a judge imposing sentence in Maryland is extremely broad. *Logan v. State*, 289 Md. 460, 480, 425 A.2d 632, 642 (1981). *Only three grounds for appellate review of sentences are recognized in this state:* (1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits. *Teasley v. State*, 298 Md. 364, 470 A.2d 337, 340 (1984).

(Emphasis supplied). The sentences in this case were not cruel and unusual, were within the statutory limits, and were not motivated by ill-will, prejudice, or other impermissible considerations.

 More directly to the point, the appellant noted no objection to Judge McKee's comment and nothing, therefore, is preserved for appellate review. Although an illegal sentence may be challenged at any time, there is nothing *per se* illegal about a sentence based on an impermissible consideration. An illegal sentence is one that exceeds the statutory limit. The sentences in this case did no such thing.

**CONVICTION FOR MOTOR VEHICLE THEFT UNDER COUNT FIVE VACATED AND MERGED INTO CONVICTION FOR ROBBERY; CONVICTION FOR THEFT OF PROPERTY OF VALUE OF $500 OR MORE UNDER COURT SIX VACATED AND MERGED INTO CONVICTION FOR ROBBERY; JUDGMENTS IN ALL OTHER REGARDS AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND PRINCE GEORGE'S COUNTY.**